**H. L. MOORE DRUG EXCHANGE, division of/and Levitt Industries, Inc., Plaintiff-Appellee,**

v.

**ELI LILLY AND COMPANY, Defendant-Appellant.**

**No. 9, Docket 81–7090.**

United States Court of Appeals, Second Circuit.

Argued Sept. 11, 1981.

Decided Oct. 16, 1981.

Jack Kaufmann, New York City (Edward N. Sherry, David B. Howorth, Robert M. Peak, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, of counsel), for defendant-appellant.

I. Scott Bass, New York City (Sheldon S. Lustigman, Bass, Ullman & Lustigman, New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

MANSFIELD, Circuit Judge:

In this action pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, defendant Eli Lilly and Company ("Lilly"), one of the nation's largest manufacturers and distributors of pharmaceutical products, appeals

from an order of the Southern District of New York entered by Judge Robert W. Sweet, denying Lilly's motion for judgment notwithstanding the verdict or for a new trial, made after a jury trial resulted in a special verdict finding Lilly liable for unlawful termination of H. L. Moore Drug Exchange ("Moore"), one of its wholesalers, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and from a judgment awarding damages, attorneys' fees, and granting injunctive relief against Lilly. From 1971 to 1976 Moore, a nationwide wholesaler of pharmaceuticals, was an authorized wholesaler for Lilly. Moore claimed that its termination in April, 1976, was due to a conspiracy between Lilly and certain of its wholesalers to restrict territories and maintain prices. We reverse on the ground that there was insufficient evidence of the alleged illegal conspiracy to support the jury verdict.[1]

Guided by the standard that the evidence must be viewed in the light most favorable to the prevailing party (see pp. 940-941, *infra*), we summarize the record proof. Since at least 1896, Lilly has sold its drug products only to authorized wholesalers, and currently sells to some 367 wholesalers throughout the country. As part of its wholesaler-only policy, Lilly has long had an announced corollary policy of selling only to wholesalers not affiliated with retail pharmacies. On October 23, 1973, Lilly reaffirmed its "non-affiliation policy" in a letter to all its wholesalers which stated that Lilly was continuing "some long-established policies," namely that it

> "will *not* sell its products directly to retail pharmacies or hospitals or to wholesalers who directly or indirectly own or control, are owned or controlled by, or are under common ownership or control with retail pharmacies. This policy will apply to any Lilly wholesaler who becomes involved with such an ownership or control situation unless the retail pharmacy operations are divested promptly."

Moore first became a Lilly wholesaler in 1971, as part of the settlement of an earlier antitrust suit filed by Moore against Lilly. That suit arose out of Lilly's refusal to sell to Moore when Moore first entered the wholesale business as an innovator in wholesale techniques, offering discounts to retailers and using the mails to expand its market nationally. Lilly based this earlier refusal to sell to Moore on the fact that Lilly had an adequate distribution system and that Moore was not a member of the National Wholesale Druggists Association ("NWDA"). Until 1966, however, Moore was able indirectly to obtain Lilly products by purchasing them from authorized Lilly wholesalers, some of whom had actively sought Moore's clientele. In 1966 these sources refused to continue supplying Moore. Moore then filed suit against Lilly, alleging that Lilly had obtained the identities of these suppliers and was responsible for the cut-off. That suit was settled by Lilly's agreeing to sell to Moore.

At the time of the 1971 agreement Moore was owned by Parkway Distributors, which also owned over 100 "Big L" stores. The latter are retail discount stores carrying, among other things, certain non-prescription Lilly products. Although Parkway was a signatory to the 1971 wholesale agreement between Lilly and Moore, and was named in Moore's annual reports submitted by request to Lilly, Parkway's ownership of the Big L stores was not known to Mr. Manning, the Lilly executive in charge of wholesale relations, until late 1973 or early 1974. When Lilly discovered Moore's affiliation with the Big L stores, it conducted an investigation and concluded that, since the latter were not retail pharmacies but retail stores selling health and beauty aids along with some non-prescription Lilly products, they did not violate the non-affiliation policy, which was expressly limited to affiliations with "retail pharmacies."

---

1. Since we dispose of the case on this ground, we need not and do not reach Lilly's other grounds of appeal, namely, that a new trial should have been granted, that the jury instruction was erroneous, that the injunction order-

ing Lilly to continue doing business with Moore was an abuse of discretion, and that the pre-judgment interest awarded by the district court was unauthorized by law.

During the course of the Big L investigation, an officer of one of Lilly's wholesalers, Gerald Rosow, passed along to Harold Katz, a Lilly salesman, an unsolicited article from a trade publication discussing among other things Parkway's ownership of both Moore and the Big L stores. Katz was one of over 1,200 Lilly sales representatives whose primary duty was to promote Lilly products to physicians. Following his normal procedure, Katz passed the article on to Phil Shockman, Lilly's Boston District Manager, who a month or so before had spoken with Katz about Lilly's investigation of the Big L stores. Katz attached to the article a handwritten memorandum (the so-called "nail-in-the-box" memorandum), making reference to Shockman's earlier request for information and speculating about Rosow's motive for giving him the article:[2]

> "Coincidentally, some of the information therein is what we were looking for several weeks ago.
>
> "His motivation for leaving this with me? I'm sure he knows I'll send it along & subsequently, another nail in H.L.M.'s box!!"

The article and the memorandum eventually reached Mr. Manning, who at that time had already received other reports concerning the Big L stores. According to Mr. Manning, while the article may have been important, the attached memorandum was "unimportant." In any event, as already indicated, Lilly took no action concerning the Big L stores, having concluded that they were not retail pharmacies and therefore did not violate the non-affiliation policy.

Some time after the 1971 agreement Parkway, Moore's parent company, acquired Northeast Medical Supplies, Inc. ("Northeast"), which filled specialized prescriptions for various health facilities. A Lilly memorandum addressed to Mr. Manning dated January 15, 1974, mentioned Parkway's ownership of Northeast. Mr. Manning testified that this brief reference made no impression on him at the time and that as a result Lilly never made a determination whether the Northeast affiliation violated Lilly's policy.[3] Thus, with respect to both the Big L and the Northeast affiliations, Lilly did not understand Moore then to be in violation of nonaffiliation policy. Moreover, in March, 1974, Lilly was explicitly informed by Moore, in response to a questionnaire Lilly had sent to all its wholesalers, that Moore did "not have an ownership or control relationship of the character described" in Lilly's October 23, 1973, letter reaffirming its non-affiliation policy. The questionnaire response was signed by Mr. Rome, the executive vice-president and general manager of Moore.

Some time in November, 1975, Lilly learned that in October Moore had acquired

---

2. Katz' use of the "nail-in-the-box" metaphor to describe Rosow's motives in handing over the article must be viewed in its context. Rosow had the reputation of being a very aggressive wholesaler and, according to Katz, Rosow regularly "accosted" the local Lilly representative with numerous complaints about business problems such as late shipments from Lilly. With respect to Moore, Rosow had made known his feeling that Moore should not have been franchised in what Rosow considered to be his trading area, and would complain to Katz about any irregularities in Moore's operation, such as Moore's failure to correct mistaken shipments.

3. The January 15, 1974, memorandum, which was two and a half pages long and reviewed the possible retailer affiliations of 12 different Lilly wholesalers, contained the following short statement, among many other unrelated matters, with respect to Moore:

> "The parent (Parkway) through its subsidiaries operates 18 retail departments in discount stores and 114 free standing retail stores known as Big L. Stores. We are lead [sic] to believe that these activities deal in health and beauty aids. On the other hand, a major subsidiary, Northeast Medical Suppliers, Inc. supplys [sic] specialized prescription filling for various health facilities."

Mr. Manning testified that the final sentence referring to Northeast did not register or make an impression with him at the time, because "there are wholesalers who do repackaging of bulk merchandise, which is not really a prescription-filling operation, which could be referred to as that." According to Manning, only after the commencement of the trial below did he become consciously aware of Parkway's earlier affiliation with Northeast.

a chain of retail pharmacies known as the Mall Drug Stores which, unlike the Big L stores, clearly fell within the proscription of Lilly's nonaffiliation policy. The acquisition was reported in trade publications as well as the regular press, including the Wall Street Journal. In addition, at the annual meeting of the NWDA in November, Moore's acquisition was called to Lilly's attention in a general way by several wholesalers, and more specifically by Spectro Industries, a conglomerate of wholesalers located in the Northeast.[4] The executives of Spectro met with the Lilly executives, in keeping with Spectro's practice at the NWDA gatherings to meet with each of its 25 or so major suppliers in order to discuss general business matters such as sales promotion. During the course of this meeting, which was a private meeting according to Mr. Manning and which covered many topics, Spectro asked if Lilly still adhered to its non-affiliation policy, and pointed out that Moore had recently acquired a chain of retail pharmacies. Lilly responded that the policy was still in effect, and that the matter was under consideration and would be investigated.[5] There is no evidence of any agreement at the meeting relating in any way to Moore's termination or to matters such as price maintenance or territorial restrictions.

In December, 1975, Mr. Manning called Mr. Rome of Moore to ascertain information about Moore's acquisition of Mall Drug Stores and to remind Moore of Lilly's nonaffiliation policy. Mr. Rome confirmed the acquisition, explaining that it was part of Moore's plan to expand its business. He stated that Moore had no intention of divesting itself of the Mall Drug Stores and that if Lilly had further questions it should contact Moore's lawyers. Lilly decided then to wait and see if Moore would divest itself

of its retailer affiliation. When it became clear that Moore had no intention of divesting, Lilly notified Moore in April of 1976 that its then current contract, due to expire on June 30, 1976, would not be renewed because of Moore's continued affiliation with the Mall Drug Stores.

Moore then instituted the present suit, claiming that the non-affiliation policy was a mere pretext, masking an unlawful conspiracy between Lilly and certain of its wholesalers to restrict territories and control prices. Moore's complaint alleged that Lilly's termination of Moore violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976), § 3 of the Clayton Act, 15 U.S.C. § 14 (1976), and § 2 of Connecticut's Fairness in Franchising Act, Conn.Gen.Stat. Ann. § 42–133f (West Supp. 1980), and constituted a breach of the 1971 agreement between Moore and Lilly. Pursuant to Lilly's motions, Judge Lee P. Gagliardi dismissed all of Moore's claims except its claim under § 1 of the Sherman Act.

After a five-day jury trial in which six witnesses testified and 69 exhibits were introduced, the jury returned a special verdict in favor of Moore, finding that it had sustained $64,000 in damages. Lilly moved pursuant to Fed.R.Civ.P. 50(b) and 59 for judgment notwithstanding the verdict or for a new trial. Judge Sweet denied these motions. With respect to the alleged conspiracy, he found that the proof was entirely circumstantial and consisted of the inferences to be drawn from the "nail-in-the-box" memorandum, the Spectro meeting, and the history of Lilly's relationship with Moore. In addition, there was some evidence from which it might be inferred that the non-affiliation policy was a mere pretext or "sham" reason for Lilly's termination of Moore, namely, that Lilly had disregarded Moore's earlier affiliations with

---

4. There is some ambiguity about how and when Lilly first learned of Moore's acquisition of Mall Drug Stores. Mr. Manning testified that there were newspaper and trade press clippings about the acquisition, and that "concurrently or practically concurrently" with these sources Lilly also heard about the acquisition at the November, 1975, NWDA meeting.

5. There was some inconsistent testimony concerning the details of this meeting. Step, Lilly's President, said the meeting occurred over lunch; Manning placed it in a private hotel room. Garde, Spectro's President, could not recall if Moore's name was specifically mentioned during the meeting; both Manning and Step stated that the name was mentioned.

the Big L stores and Northeast, that Moore was the only Lilly wholesaler ever terminated under the policy, and that the policy had not been enforced against some of Lilly's other 367 wholesalers. Moore claimed that there were at least nine Lilly wholesalers who at some point were affiliated with retail drug operations but who were never terminated. Although there was some evidence of some connection between certain wholesalers and retailers, Lilly contended that in these nine instances the connections were much more attenuated and impermanent and pointed to the fact that in several cases the wholesalers divested themselves of their retailer affiliations after being reminded of Lilly's policy. The evidence is reasonably clear that in no case was there as clearcut and unyielding a violation of Lilly's non-affiliation policy as Moore's outright ownership of a chain of retail pharmacies and its declared intention not to divest. Judge Sweet found that, while Lilly offered explanations for the nine instances, they need not have been credited by the jury. Moore argued that the jury could infer the existence of a conspiracy from its rejection of Lilly's explanation for its termination of Moore.

In reviewing the proof of Lilly's alleged purpose to control prices, Judge Sweet found that there was evidence that Lilly, unlike the other major pharmaceutical companies, published a list of suggested retail prices, restricted its discount offerings to resales to retailers, and did not extend the discounts to sales by wholesalers to other wholesalers. The court concluded, however, that neither activity was illegal in itself, and that there was evidence that the majority of Lilly items were being sold by Lilly wholesalers below the suggested list prices. On the issue of territorial restrictions, the court referred to evidence that wholesalers have been denied Lilly contracts because there was adequate distribution in an area, and that a Lilly wholesaler—Rosow—had made clear its displeasure in Moore's enfranchisement. At the same time, however, the court noted that there was evidence that wholesalers were not restricted as to the area where they could sell, and that

most sold within a 300-mile radius of their locations because of "natural limitations" in the services they could provide. While Moore contended that its nationwide marketing was one reason for its termination, the court noted that there was evidence that other Lilly wholesalers also sold nationwide.

Concerning the anticompetitive effect of Moore's termination, Moore officials testified that Moore charged the lowest prices in the country on the Lilly line, and that Moore's discounting caused other Lilly wholesalers to cut prices to meet the competition. However, there was testimony disputing the claim that Moore's prices were the lowest. The court did note that Manning admitted that if all Lilly wholesalers sold at or below the prices charged by Moore, there would be "some economic bruising taking place." Having thus reviewed the trial evidence, Judge Sweet concluded that the evidence of conspiracy was "very sketchy," that he would not have found Lilly guilty of an antitrust violation, but that the proof was "enough—albeit barely—to support the jury's verdict." Following a further evidentiary hearing, the district court granted Moore's request for an injunction, and ordered Lilly to continue doing business with Moore.

## DISCUSSION

In considering Lilly's claim that the evidence was insufficient to support the jury verdict, we must determine, without weighing the credibility of the evidence but viewing it most favorably to the plaintiff, whether "there can be but one reasonable conclusion as to the proper judgment." 5A Moore's Federal Practice Par. 50.07[2] (2d ed. 1980); see also *Beech Cinema v. Twentieth Century-Fox Film*, 622 F.2d 1106, 1107–08 (2d Cir.1980). To do otherwise would be impermissibly to substitute our view of the evidence for that of the jury.

"If, however, after viewing all the evidence most favorably to plaintiff, we cannot say that the jury could reasonably have returned the verdict in his favor, our duty is to reverse the judgment be-

low. The jury's role as the finder of fact does not entitle it to return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial." *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).

The court's role becomes especially crucial when, as here, the plaintiff's case is based solely on circumstantial evidence. *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 116 (3d Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

■ The central issue in this case is whether Moore was terminated pursuant to an illegal conspiracy between Lilly and one or more of its wholesalers to control resale prices and to restrict the territories in which Lilly products could be sold. (Compl. Par. 24–26, 35, 39). A unilateral refusal by Lilly to deal with a wholesaler, absent proof that it was pursuant to a conspiracy, does not violate § 1 of the Sherman Act. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75 (2d Cir.1980). Moore could prevail only if it proved that its termination stemmed from "a contract, combination or conspiracy" between Lilly and certain of its wholesalers. *Oreck, supra*, at 79.

Conspiracies, of course, are rarely evidenced by explicit agreements, but must almost always be proved by "inferences that may fairly be drawn from the behavior of the alleged conspirators." *Michelman v. Clark-Schwebel Fiber Glass Corp., supra*, 534 F.2d at 1043. At a minimum, however, "the circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

■ Although the evidence warranting an inference of concerted action will vary from case to case, courts have laid down fairly specific guidelines about what will be considered insufficient as a matter of law to warrant the inference of a conspiracy. Thus "[a] mere showing of close relations or frequent meetings between the alleged conspirators ... will not sustain a plaintiff's burden absent evidence which would permit the inference that these close ties led to an illegal agreement." *Oreck, supra*, 639 F.2d at 79. Nor does a manufacturer's mere receipt of complaints from its wholesalers or agents who compete with the plaintiff, or its consultation with such other competing wholesalers, standing alone, support a finding of conspiracy with them. *Id.* at 80; *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 395 (2d Cir. 1980); *Modern Home Institute v. Hartford Accident & Indemnity Co.*, 513 F.2d 102 (2d Cir. 1975); *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105 (3d Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Even where a termination follows the receipt of complaints from wholesalers or agents, there is no basis for inferring the existence of concerted action, absent some other evidence of a tacit understanding or agreement with them. *Modern Home Institute v. Hartford, supra; Edward J. Sweeney & Sons v. Texaco, supra; A. G. Rogers Co. v. Merck & Co.*, 498 F.Supp. 5 (E.D.Tenn.1980). Finally, the mere fact that a business reason advanced by a defendant for its cut-off of a customer is undermined does not, by itself, justify the inference that the conduct was therefore the result of a conspiracy. *Beech Cinema, supra*, 622 F.2d at 1109; *Lamb's Patio Theatre, Inc. v. Universal Film Exchanges, Inc.*, 582 F.2d 1068, 1070 & n.2 (7th Cir. 1978). Even if a manufacturer or supplier, acting independently, gave a false or inaccurate reason for its action, whether because of a desire to avoid controversy or some other consideration, this would not violate any legal obligation to the customer, absent proof of a conspiracy or breach of contract.

■ With these principles in mind we consider whether the evidence here could reasonably support an inference that Moore was cut off pursuant to a conspiracy be-

tween Lilly and one or more of the other wholesalers to maintain resale prices and to restrict the territories within which Lilly products could be sold by wholesalers. Moore contends that the jury was entitled to infer such a conspiracy or an unlawful scheme from (1) proof that Lilly's invocation of the non-affiliation policy as the reason for the termination was a sham, (2) the "nail-in-the-box" memorandum, (3) the Spectro meeting, coupled with wholesaler complaints about Moore, and (4) speculation that Lilly may have imposed territorial and price maintenance controls, based in part on Lilly's suggested retail price list. We disagree. The evidence, viewed separately or taken as a whole, was insufficient to permit a finding of the alleged conspiracy or unlawful scheme.

### Lilly's Non-Affiliation Policy

The record is clear that Lilly did have a non-affiliation policy. The October 23, 1973, letter reaffirming the policy, the subsequent questionnaire Lilly sent to all its wholesalers inquiring about their adherence to the policy, the numerous references in the record to various attempts by Lilly to enforce the policy against other wholesalers, and the undisputed fact that Lilly conducted an investigation of the Big L stores

to determine whether there was a violation on Moore's part, all firmly establish that such a policy did in fact exist.

Moore, however, argues that the policy was not enforced stringently but on a highly selective basis, pointing to nine examples (out of some 367 Lilly wholesalers) where Moore claims the policy was not enforced. However, of these nine examples only five (Kiefer-Stewart Co., Kauffman-Lattimer Co., Jax Drugs, Neuman Wholesale Drug, and Rogers Wholesalers Inc.) involved arguable violations of the non-affiliation policy; of these, three wholesalers divested themselves of their retailer affiliations, one has been notified by Lilly that its franchise will be terminated, and another has been determined not to involve an ownership interest and is therefore not a violation.[6] Thus, even among the nine cases, Lilly enforced its policy when it suspected a violation. This hardly makes out a case of selective enforcement.

Moore counters that there were often substantial delays between Lilly's discovery of a suspected violation and the eventual divestiture by the wholesaler of its retailer affiliation. Yet typically these delays occurred in cases where wholesalers had

---

**6.** In three instances, Kiefer-Stewart Co., Kauffman-Lattimer Co., and Jax Drugs, the wholesalers divested themselves of their retailer affiliations, although there was some conflicting testimony concerning the promptness with which Lilly sought to enforce its policy. Jax Drugs also leased space in its hospitals and nursing homes to independent retail pharmacists, but there was no question of any ownership interest involved.

Neuman Wholesale Drug, which owns a retail pharmacy (Automated Pharmaceuticals, formerly Northeast Medical Suppliers, Inc., when it was owned by Parkway), was notified during the course of the trial below that it would be terminated. With respect to Rogers Wholesalers, Inc., the alleged affiliation consisted of the fact that a corporation that held some convertible preferred stock in Rogers also owned a retail pharmacy. Mr. Manning testified that Lilly's non-affiliation policy applied to ownership interests, which would not arise until the preferred stock was converted to common stock.

In three other instances, there was no evidence that the wholesalers as such owned or

operated any retail pharmacies; the evidence only established that certain individuals who were involved with the wholesalers in various capacities had some very attenuated connections with retail operations as private individuals, as follows: (1) Four individual shareholders of Drug Guild Distributors were officers of retail pharmacies; (2) the son of the owner of D.A. Rosow Co. owned retail pharmacies; and (3) some members of the family that owned Lee and Osgood had loaned money to a friend who used it to purchase retail pharmacies.

Although there was some evidence that Sisson Drug operated a retail pharmacy shortly after WW II, there was no evidence that Lilly knew about this and Mr. Manning specifically denied any such knowledge.

More generally, the record showed that in some or all of these instances, it was the wholesalers themselves who brought to Lilly's attention the possible violations and then willingly negotiated with Lilly with a view to make alternative arrangements that would avoid violating Lilly's policy.

promptly assured Lilly of their intention to divest or to search for alternative arrangements, and were involved in ongoing discussions with Lilly, which in part accounts for some of the delays.[7] In sharp contrast is Mr. Rome's declaration to Lilly in December 1975 that Moore had no intention of divesting. In view of the fact that Moore was the only wholesaler who had declared its intention to be "100 percent" in the retail business, which was "clearly in violation of [Lilly's] basic policy" (Tr. 497–98), its termination does not provide a basis for the inference sought by Moore.

In any event, viewing the nine examples in the light most favorable to Moore, the most that the jury could permissibly infer was that Lilly had some reason other than its non-affiliation policy for terminating Moore. Indeed, Moore so argues, stating that "Lilly's use of a false reason for termination ... provides the inference that Lilly had another reason that it was concealing." Moore's Brief, p. 6. But such a pretext would not itself establish a conspiracy. The fact that Lilly may have had other reasons to terminate Moore makes it neither more nor less probable that Lilly acted in concert with others rather than unilaterally. As the Seventh Circuit stated in *Lamb's Patio Theatre, Inc. v. Universal Film Exchanges, Inc.*, 582 F.2d 1068, 1070 (7th Cir. 1978):

> "It is not enough, therefore, that Lamb's allege an inconsistency in Universal's course of dealings or that its business reasons for rejecting Lamb's bid were inaccurate. Absent a showing of conspiracy by Lamb's Universal had no obligation to produce any reasons for refusing to deal with Lamb's. Thus even if Lamb's could show that Universal's announced business reasons were not legitimate, such showing would not satisfy Lamb's burden of establishing the existence of the conspiracy element essential to its prima facie antitrust case. [Footnote omitted]."

*The "Nail-in-the Box" Memorandum*

We likewise conclude that the memorandum written by Lilly salesman Katz and attached to the article forwarded by wholesaler Rosow containing information about Moore's Big L affiliation fails to support an inference of a conspiracy. Even if Rosow's decision to forward the article to Lilly was motivated by Rosow's desire to pressure Lilly to terminate Moore, this alone is insufficient to establish concerted action. As the Court stated in *Modern Home Institute, supra*, 513 F.2d at 112:

> "A company's concern over the possible alienation of its agents is a legitimate basis for independent protective action on its part, which cannot be viewed as conspiratorial in the absence of some evidence of tacit understanding with competitors. Mere pressure by the agents themselves would not provide a basis for such an inference."

Moore claims that the existence of a conspiracy is evidenced by Lilly's "having [the Katz] memorandum prepared and by having it pass from level to level up the executive ladder." In the first place, this is an inaccurate characterization. The Katz memorandum was no more than a casual, handwritten note by one of over 1,200 Lilly salesmen who merely, in accordance with the salesman's normal procedure for handling wholesaler complaints, forwarded to his superior the trade publication article received from Rosow. The important item was the article, which contained financial data relevant to Lilly's then current investigation of the Big L stores, not the salesman's covering memorandum. In any event, Lilly's treatment of Rosow's complaint as a serious matter would not give rise to an inference of a conspiracy.[8]

Moore argues that the Rosow complaint and the Katz memorandum take on height-

---

7. For instance, Rogers Wholesalers, Inc., in response to Lilly's questionnaire sent to all Lilly wholesalers, indicated that it did have a retail affiliation in violation of Lilly's policy, and indicated its intention to divest. Subsequently, Rogers indicated in discussions with Lilly that its attorneys were attempting to solve the problem.

8. Complaints about the business practices of a competitor "would not indicate illegal concerted action, since it is merely normal marketplace behavior for such complaints to be

ened significance in the context of what Moore characterizes as a "flurry of complaints" lodged by wholesalers opposing Lilly's initial decision to sell to Moore in 1971. The record fails to support this claim, showing only that a single wholesaler, Rosow, who was concededly displeased with Moore's presence in what it considered to be its trading area, had made a point of bringing to Lilly's attention any irregularities in Moore's operations.[9] This reflects Rosow's motives, but is not probative on the central issue of whether Lilly acted unilaterally or in concert with others.

Even if, as the trial court concluded—in our view inaccurately—the "note has some element of consensuality about it by virtue of its vivid language and its progress through the Lilly chain of command," it fails to support Moore's claim of conspiracy. While the note was written in May, 1974, Moore was not terminated until April, 1976. The 1974 Katz memorandum and the Rosow article related only to Moore's affiliation with the Big L stores. Moore, however, was later terminated because of a completely different affiliation, its acquisition of the Mall Drug Stores, a chain of retail pharmacies which Moore did not acquire until 18 months after the Katz memorandum was written. Some time in 1974, after receiving the Katz memorandum, Lilly had completed its investigation of the Big L stores and concluded that Moore's connection with them did not violate the non-affiliation policy because they were not "retail pharmacies." The Katz memorandum does not therefore support the existence of a conspiracy two years later to terminate Moore.

Moore attempts to explain the time lag by arguing that Lilly could not use the Big L affiliation as a viable excuse to terminate Moore in 1974 because Lilly had already known about it since 1971; therefore, the argument goes, "Lilly had to wait for a better excuse." Moore's Brief, p. 12. This theory is simply not supported by the evi-

dence. Moore's factual premise is incorrect, as the record shows that Lilly became aware of the Big L stores only in late 1973 or early 1974. Moreover, if Lilly felt it could not viably terminate Moore because of its Big L affiliation since, according to Moore, it had been known to Lilly as early as 1971, there would have been no reason for Lilly in 1974 to conduct an investigation of the Big L stores, and no reason for Lilly to attach any significance to either the Rosow article or the Katz memorandum, which under Moore's theory merely contained information already known to Lilly for several years. Furthermore, if Lilly was so eager to "find an excuse" to terminate Moore, it could have used Moore's affiliation with Northeast, which Moore apparently acquired after becoming a Lilly wholesaler in 1971. Yet, not only did Lilly fail to conduct an investigation of Northeast, but Manning, Lilly's executive in charge of wholesaler relations, testified that he completely overlooked the Northeast affiliation as a possible violation of Lilly's policy.

The only reasonable inference concerning the Katz memorandum and the events surrounding it is that Lilly received Rosow's complaint, considered the complaint in the process of its then ongoing investigation of the Big L stores, and unilaterally determined that Moore's affiliation with the Big L stores was not a violation of Lilly's non-affiliation policy. The evidence cannot reasonably support an inference of a conspiracy and, in any event, there is no connection between the events in 1974 and Lilly's termination of Moore two years later.

### The Spectro Meeting

The evidence concerning the Spectro meeting at most establishes that Lilly received a complaint from another of its wholesalers about Moore's violation of the non-affiliation policy, which does not justify

---

made." *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 80 (2d Cir. 1980).

**9.** Katz in his testimony used the phrase "flurry of complaints" to refer only to the fact that the

several principals of D.A. Rosow complained to Lilly about Moore's inability "to service returns or correct mistakes." (Tr. 278).

an inference of a conspiracy in the absence of some evidence that Lilly and Spectro had expressly or impliedly agreed to terminate Moore in order to maintain resale prices and restrict wholesalers' sales territories. There is little dispute about the substance of the meeting, at which Spectro pointed out (as Lilly already knew) that Moore had recently acquired the Mall Drug Stores and asked if Lilly still adhered to its non-affiliation policy, to which Lilly responded that its policy was still in force and that the matter was already under consideration and would be further investigated. All three witnesses who testified about the meeting denied that any agreement was reached that related in any way to Moore's termination.

The evidence is clear that Spectro routinely met with its suppliers at the annual NWDA meetings in order to conduct general business discussions, and that the meeting with the Lilly executives was one such meeting. While there was some inconsistency among the three witnesses' 1979 testimony concerning the particular details of the circumstances of a 1975 meeting, which is understandable, the evidence does not support Moore's claim that the meeting was a "secret, private 'summit'" requested by Spectro "in order to discuss Moore." Moore's Brief, pp. 14, 20. In *Modern Home Institute, supra*, we stated that even evidence of "pressure" by complaint competitors cannot support an inference of a conspiracy. See also *A.G. Rogers Co. v. Merck & Co.*, 498 F.Supp. 5, 7 (E.D.Tenn.1980). Where, as here, the evidence fails to reveal anything other than the receipt of a complaint by Spectro, it would be impermissible to allow the jury to speculate about the existence of a conspiracy.

### Allegation of Scheme to Impose Territorial and Price Maintenance Controls

Moore argues that, even where a decision to terminate is unilaterally made, it may nevertheless constitute an antitrust violation if it was made as part of an overall scheme to maintain territorial and resale price controls, relying on *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d

998 (1968); *Simpson v. Union Oil of California*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *United States v. Parke Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 416 F.Supp. 564 (S.D.N.Y.1976), *aff'd*, 548 F.2d 438 (2d Cir. 1977) (granting preliminary injunction preventing termination). We have summarized the holdings of the Supreme Court cases in the following way:

> "[A] manufacturer or publisher may not enforce his announced resale prices by active coercion of those who purchase for resale, such as through threats of termination for non-compliance, whether made in combination with others or alone." *Bowen v. New York News, Inc.*, 522 F.2d 1242, 1254 (2d Cir. 1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976) (citations omitted).

The evidence here simply does not support the existence of an overall scheme to control prices and territories. Although Lilly published a set of suggested retail prices, the record is devoid of any proof that Lilly sought to enforce these prices through active coercion or any other means. On the contrary, the evidence reveals that the majority of Lilly items were being sold by Lilly wholesalers below the suggested retail prices, with no evidence of actual or threatened termination. In addition, Lilly does not restrict the territories where wholesalers may sell. Most Lilly wholesalers sell within a local area only because of natural limitations on the services they can provide. Some wholesalers, however, like Moore, sell their products nationwide. There is no evidence that either the "nail-in-the-box" memorandum or the Spectro meeting had anything to do with prices and territories; indeed, the evidence indicated that they only related to Moore's violation of the non-affiliation policy. Moore's contention must therefore be rejected.

### Conclusion

We are fully aware of the principle that, although important items of circumstantial evidence considered separately may not jus-

tify an inference of combination or conspiracy, they may be sufficient when viewed together as part of one mosaic. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99, 82 S.Ct. 1404, 1409–10, 8 L.Ed.2d 777 (1962). However, in this case, even when the items relied upon by Moore are taken together and considered against the background and surrounding circumstances, they did not entitle the jury reasonably to infer the existence of a conspiracy. Any such inference would of necessity have had to be based on speculation.

Since the evidence was insufficient to support a finding of conspiracy or unlawful combination we need not consider whether Lilly's action was motivated by anticompetitive reasons, since a unilateral decision to terminate, no matter what the reason, does not constitute a violation of the antitrust laws. Nor is it necessary to decide whether the district court erred in its instructions to the jury, in its grant of injunctive relief, or in its award of pre-judgment interest.

The judgment of the district court is reversed with directions, on remand, to enter a judgment dismissing the complaint. Costs are awarded to appellant.