**VENTURE TECHNOLOGY, INC.,**
**Plaintiff-Appellee,**

v.

**NATIONAL FUEL GAS COMPANY,**
**Defendant,**

**National Fuel Gas Distribution Corporation and Flint Oil & Gas Company, Inc., Defendants-Appellants.**

Nos. 1212, 1213, Dockets 81–7069, 81–7107.

United States Court of Appeals, Second Circuit.

Argued June 8, 1982.

Decided July 26, 1982.

Certiorari Denied Nov. 8, 1982.
See 103 S.Ct. 362.

Grant S. Lewis, New York City (LeBoeuf, Lamb, Leiby & MacRae, New York City, Frederick R. Dettmer, Charles C. Platt, New York City, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N. Y., William L. Rieth, Robert E. Glanville, Buffalo, N. Y. of counsel), for defendant-appellant National Fuel Gas Distribution Corp.

Robert B. Conklin, Buffalo, N. Y. (Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N. Y., of counsel), for defendant-appellant Flint Oil & Gas Co., Inc.

James M. Hartman, Rochester, N. Y. (Harris, Beach, Wilcox, Rubin & Levey, Rochester, N. Y., Edward C. Hooks, Eugene C. Holloway, III, Richard L. Smith, Rochester, N. Y., of counsel), for plaintiff-appellee.

Before FEINBERG, Chief Judge, CARDAMONE, Circuit Judge, and SAND,* District Judge.

SAND, District Judge.

National Fuel Gas Distribution Corporation ("Distribution") and Flint Oil & Gas Company, Inc. ("Flint") appeal from a judgment of the United States District Court for the Western District of New York (Elfvin, J.) awarding plaintiff Venture Technology, Inc. ("Venture") $1,500,000 in trebled damages. After an eight week trial, and one week of deliberation, the jury found that the appellants had violated § 1 of the Sherman Act, 15 U.S.C. § 1, and the analogous provision of the New York Donnelly Act, N.Y.Gen.Bus.Law § 340 (McKinney 1968),[1] but that there was no violation of § 2 of the Sherman Act, 15 U.S.C. § 2. Defendants' motions for a directed verdict, judgment n. o. v., and a new trial were denied as to Distribution and Flint, and judgment was entered on January 13, 1981.

Venture alleged, and the jury found, that Flint and Distribution conspired, in violation of the antitrust laws, to prevent Venture from entering the western New York gas production business and that Venture suffered substantial damages as a result.

Distribution and Flint raise several significant issues on appeal. First, the appellants contend that the evidence presented at trial was insufficient as a matter of law to permit an inference of conspiracy. Second, they assert that the court below erroneously instructed the jury as to per se violations of the antitrust laws, rather than charging according to the general rule of reason standard. The appellants claim that the trial judge committed reversible error by giving per se charges on a refusal to deal or group boycott theory, on a horizontal price fixing theory, and on an essential facility theory. Third, the appellants contend that Venture failed to prove that the defendants' conduct was a material and proximate cause of its alleged injury. They further assert that there was insufficient evidence at trial from which the jury could make a rational determination of damages and that the verdict was an impermissible compromise between liability and damages.

A plaintiff in a civil action, in order to sustain its claim under § 1 of the Sherman Act, must prove the existence of a "con-

* United States District Judge for the Southern District of New York, sitting by designation.

1. The Donnelly Act was modeled after the Sherman Act, and the same standard applies under both statutes to the issues that are relevant here. *See, e.g., Saxe, Bacon & Bolan v. Martindale Hubbell, Inc.,* 521 F.Supp. 1046, 1981–2 Trade Cases ¶ 64,212 at 73,815, 73,818 (S.D.N.Y.1981); *Optivision, Inc. v. Syracuse Shopping Center Associates,* 472 F.Supp. 665, 680–81 (N.D.N.Y.1979). Although our discussion speaks only in terms of the plaintiff's Sherman Act claims, it is applicable as well to the plaintiff's claim under the Donnelly Act.

tract, combination . . ., or conspiracy."[2] In light of our conclusion that there was not sufficient evidence to prove the existence of such a relationship in this case, we do not reach the appellants' other contentions.

## A. FACTS

The record shows that Distribution, a wholly owned subsidiary of co-defendant National Fuel Gas Company, is a public utility which supplies natural gas to consumers in western New York, western Pennsylvania, and a portion of Ohio.[3] At the time of the operative events in this case, Distribution received a small portion of its gas supply from local sources and about 90% of its gas supply from interstate pipelines, originating primarily in the southwestern United States.

In the early 1970s, Distribution's predecessor, Iroquois Gas Company ("Iroquois"), sought to induce independent companies to drill wells and produce the gas which Iroquois would purchase. Iroquois therefore began to assign, or "farm out," some of its acquired gas leases to independent production companies. This purchase program was later administered by Distribution under the management of John Fox, the assistant secretary and director of gas purchases for Distribution.

Flint was formed in the early 1970s, and by 1975 it had drilled between 100 and 200 wells and was one of the largest sellers of western New York natural gas to Distribution. There was substantial contact between officers of Distribution and officers of Flint, particularly by Fox. Fox attended some of the meetings Flint held to attract investors and answered questions about the natural gas purchase program. He helped Flint obtain a number of its well sites and regularly visited Flint's offices and met with its board of directors to provide "advice and counsel."

Fox reaped substantial financial benefits from his relationship with Flint. Fox and his wife operated Priority Acquisitions, Inc. ("Priority"), a real estate agency which acquired approximately 200 leases for Flint, and which was paid one dollar per acre by Flint for each lease. Priority never secured such leases for other producers in the western New York area. In 1973, Priority arranged the sale of a 167 acre parcel located in Alden, New York to Flint for $100,460, the same price that had been offered by another prospective purchaser. The property had been purchased by the seller in 1971 for $50,000. Flint sold the property in January, 1980 for $102,000. Priority's commission on the sale to Flint was more than $17,000. It is undisputed that Distribution was aware of the Priority/Flint relationship and approved of it.

Venture was formed by William L. Waytena to engage in the gas production business. Waytena had previously been an investor in several of Flint's drilling projects, and he continued his investments in Flint activities at least through the time of the trial. Waytena testified that it was his intention to have Venture drill a few successful wells, thereby demonstrating Venture's capability, and then to launch a well drilling program financed by outside investors.

By November, 1975, Venture had made plans for wells on five leased sites, known as the Boyd, Grant, Frey, Bennett, and Nickerson sites. Venture commenced work, apparently assuming that any gas it produced would be purchased by Distribution. However, none of Venture's officers approached Distribution to discuss purchase contracts before Venture began drilling.

At about this time, Flint's President, Salvatore Giallombardo called Fox to complain about Venture. According to the testimony, their conversation was limited to Giallombardo's insistence that Venture's wells were located too close to Flint's and his

---

**2.** 15 U.S.C. § 1. As a matter of convenience, we use the word "conspiracy" in this Opinion to include all three statutory terms.

**3.** National Fuel Gas Company is also the parent of National Fuel Gas Supply Corporation ("Supply"), which acquired gas for resale by Distribution. In 1975 and 1976, Supply produced about 3–4% of the gas sold to Distribution.

demand that Distribution honor its commitment to buy Flint's gas before it obligated itself to purchase from Venture.[4]

On November 19, 1975, representatives of Distribution met for the first time with Venture's officers. Distribution's Henry Steadman and Allen Graham indicated that their company was in the process of developing a well-spacing policy, which would establish restrictions on the location of wells from which Distribution would purchase gas. Venture was shown the New York State regulations governing well-spacing as a guide to what Distribution's forthcoming policy might require. Graham stated that he was unable to set a price for the purchase of Venture's gas until after resolution of Distribution's pending application before the New York State Public Service Commission for approval of a price escalator clause in its gas purchase contracts. Venture offered to sell gas at the prevailing rates and, according to Waytena, the meeting ended with an understanding that Distribution would purchase Venture's gas.

A few days later, Venture received a copy of Distribution's spacing policy and a request for more information about its leases. The spacing policy provided that Distribution would not purchase gas from wells on leases of less than 40 acres, located closer than 1320 feet from another well, or located less than a certain number of feet from dwellings, property lines, and roads. This policy was similar to the regulations of New York's Department of Environmental Conservation, but, unlike those regulations, it applied retroactively to areas in which there was previous drilling. The spacing requirements were said to be necessary to protect drillers' financial expectations by preventing others from drilling into the same pool of gas and to protect a landowner from the draining of gas reserves under his land by a well located on an adjoining small property. Distribution's policy permitted it to waive the spacing requirements in particular circumstances.

On December 3, 1975, representatives of Venture and Distribution met again, and Venture was informed that gas from the Boyd and Grant sites would not be purchased, at least in part because these wells did not comply with the spacing policy. Although Venture was told at that time that it would be able to drill at the Frey site, Fox informed it two days later that the proposed Frey well was too close to a proposed Flint well from which Distribution was committed to buy gas.

A Public Service Commission hearing was held on December 4, 1975, at which Distribution was seeking to justify the price escalator clause employed in its gas purchase contracts. The evidence indicates that when William Lerner, Venture's attorney, began to testify that the clause was not necessary, he was "shouted . . . down" by Giallombardo.

On December 17, 1975, Distribution advised Venture that it would ask Flint to work out the spacing policy conflict as to the Frey site, and there was evidence that steps to accomplish this were taken. On December 23, 1975, Frey's attorney wrote to Lerner, declaring Venture's lease null and void since drilling had not begun within the time set in the lease, and the next day a lease for the same property was executed with Flint. There was evidence that Flint had previously advised Frey that Venture would have difficulty selling its gas to Distribution and that Flint would have no such problem. Furthermore, when the owner of the Frey leasehold asked Distribution about other producers who might be able to drill on his property, Fox mentioned Flint, as well as some other producers. When Flint did drill a well on the Frey site, Distribution purchased its output. Soon after it lost the Frey lease, Venture allowed its leases for the Nickerson and Bennett properties to expire, and Clearwater, another company formed by Waytena, acquired drilling rights at these sites. Distribution bought gas from both of these Clearwater wells.

---

4. There was substantial evidence that, during this time, Distribution was suffering from pipeline bottlenecks and that some wells, among them Flint's, awaited hook-up for nearly a year.

In May, 1976, immediately prior to filing suit, Waytena bought out the interests of Venture associates Panaro and O'Neill, who each owned one-third of Venture, for $5,000 each, thereby acquiring all of the shares of Venture. All of Venture's major participants, including Waytena, continued their activities in the gas supply business through other corporate entities.

## B. *THE SUFFICIENCY OF THE EVIDENCE*

■ The appellants argue that the evidence was insufficient as a matter of law to permit an inference of a conspiracy between Distribution and Flint. This Court must determine whether the evidence, viewed in the light most favorable to the plaintiff, was sufficient to support the verdict rendered. *Schwimmer v. Sony Corp. of America*, 677 F.2d 946 (2d Cir. 1982); *H. L. Moore Drug Exchange v. Eli Lilly and Co.*, 662 F.2d 935, 937, 940 (2d Cir. 1981), *petition for cert. filed*, 50 U.S.L.W. 3984 (U.S. May 28, 1982) (No. 81–2215). We must ascertain whether " 'there can be but one reasonable conclusion as to the proper judgment' . . . To do otherwise would be impermissibly to substitute our view of the evidence for that of the jury." *Moore Drug, supra*, at 940, *quoting* 5A Moore's Federal Practice ¶ 50.-07[2] (2d ed. 1980). *See Beech Cinema v. Twentieth Century-Fox Film Corp.*, 622 F.2d 1106, 1107–08 (2d Cir. 1980).

■ Upon review of the record in this case, this Court is convinced that there was not sufficient evidence from which the jury could rationally conclude that Distribution and Flint had entered into a conspiracy to keep Venture from entering the western New York gas production business.

As this Court has explained, § 1 of the Sherman Act

"is directed only at joint action. . . . It does not prohibit independent business actions and decisions. A person still has the right to refuse to do business with another, provided he acts independently and not pursuant to an unlawful understanding, tacit or expressed. Fundamental then to any § 1 claim is the finding of

an agreement, express or otherwise, between two or more persons."

*Modern Home Institute, Inc. v. Hartford Accident and Indemnity Co.*, 513 F.2d 102, 108–09 (2d Cir. 1975) (citations omitted). Illegal conspiracies, of course, can rarely be proved through evidence of explicit agreement, but must generally be proved through inferences from the conduct of the alleged conspirators. *See Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). It is clear, however, that "the circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

Recent cases in this Court, on which the appellants rely, have dealt with particular fact situations in which the evidence was insufficient as a matter of law to warrant the inference of conspiracy. In *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75 (2d Cir. 1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981), for instance, we affirmed a directed verdict for the defendant, and held that "[a] mere showing of close relations or frequent meetings between the alleged conspirators . . . will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement." *Id.* at 79. Less than a year later, we stated:

"Nor does a manufacturer's mere receipt of complaints from its wholesalers or agents who compete with the plaintiff, or its consultation with such other competing wholesalers, standing alone, support a finding of conspiracy with them. . . . Even where a termination follows the receipt of complaints from wholesalers or agents, there is no basis for inferring the existence of concerted action, absent some other evidence of a tacit understanding or agreement with them."

*Moore Drug, supra*, at 941 (citations omitted). *See also Schwimmer, supra*, at 2425–26; *Oreck, supra*, at 80.

When we measure the evidence here against the standards laid down in *Oreck* and *Moore Drug*, we must do so in the light of the history and circumstances in the industry in which the parties were engaged. Upon such consideration, we find that, for a number of reasons, the evidence presented at trial falls far short of the requirements set forth in those cases.

In our decision in *Oreck*, we rejected the contention that the inherent relationship between Whirlpool and its largest customer and an important shareholder, Sears, was sufficient to support an inference of antitrust conspiracy. This was so despite proof of meetings between the two companies, Sears' complaints about the plaintiff, and Sears' ownership of the tools used to manufacture Whirlpool's products. The Whirlpool/Sears relationship was practically one of dependency, and surely was stronger, more apparent, and more significant to the parties than the Distribution/Flint relationship here.

From Distribution's standpoint (putting to one side for the moment Flint's alleged corruption of Fox), the entire Venture matter was not of great moment. Of all the natural gas purchased and resold by Distribution, only a small percentage was locally produced, and there were a significant and growing number of independent producers. Although Flint was one of the two largest local producers, its 100 to 200 wells and its willingness to drill further, can not have been of prime concern to Distribution.

Venture sometimes contends that Distribution sought to punish it for having the temerity to oppose the price escalation and short tract well-spacing policies. But such evidence makes it neither more nor less likely that Distribution acted unilaterally, and is, in any event, largely conjectural. For that reason, Venture stressed here, as it did before the jury, the theory that Fox, Distribution's chief purchasing executive, had been bribed and had "sold his soul" to Flint.

The plaintiff makes much of the fact that Fox met with Flint's potential investors. However, this conduct appears unremarkable in light of the evidence that Fox often met with drillers and investors, albeit not in formal meetings, as part of his efforts to induce producers to commence operations in western New York. Even more importantly, Priority's involvement in the sale of the Alden property (the alleged corruption) took place approximately one year prior to Venture's formation, and Flint purchased this property at the identical price which had been negotiated with another potential buyer. There is simply no evidence whatsoever that the payments to Priority served as consideration for Distribution's alleged anti-Venture actions. As in *Oreck*, this evidence merely shows close relations, and fails to demonstrate that Flint and Distribution engaged in conspiratorial conduct.

The actions of Waytena, his relationship with Distribution, and the history of western New York gas production belie the alleged conspiracy. Any consideration of Venture's actions must take into account the actions of its founder, and ultimately its sole shareholder, Waytena. For all intents and purposes, Waytena operated Venture as a sole proprietorship, issuing stock in the company only after it had already ceased business and was preparing for litigation. Yet it is clear that Distribution did business with other companies in which Waytena was a principal. Indeed, when Venture ceased operations, the Bennett and Nickerson leases were acquired by another Waytena company, Clearwater, which proceeded to drill and sell its gas to Distribution.

Furthermore, Flint, at least partially in response to the effect of Distribution's well-spacing policy, has relocated a substantial portion of its drilling activity from New York to Ohio. The number of producers drilling in the relevant area of western New York grew from 35 in 1974 to more than 100 at the time of trial, including, as noted above, producers in which Waytena and his prior associates have major interests.

Against this background, the jury was asked to find that Flint and Distribution conspired to put this one particular Waytena corporate entity out of business, presum-

ably because its wells intruded upon Flint's. Nothing but sheer speculation would support the conclusion that this occurred.

■ The plaintiff's reliance on Distribution's well-spacing policy to support an inference of conspiracy must fail since there was no evidence that Flint had any role in the adoption of the policy or the timing of its implementation. Any claim of unity of purpose, common design and understanding, or meeting of the minds based on this policy cannot be credited given Flint's clear and consistent public objection to it and the uncontroverted evidence that the policy substantially harmed Flint and was a factor in its move to Ohio. The plaintiff's argument with respect to the policy is rendered even less convincing by the evidence that Flint received only a small percentage of the spacing waivers it sought, and that Distribution took some steps to work out an accommodation between Flint and Venture as to the Frey lease's spacing problems.

The evidence of attempted accommodation also undermines the contention that the circumstances surrounding the Frey lease point to a conspiracy. Additional evidence demonstrates that Frey declared Venture's lease null and void since Venture had not begun its drilling operations in the time specified by the lease. This was an important provision to Frey since timely drilling would provide him with various tax advantages, and only through sheer speculation could a jury conclude that Distribution and Flint engineered Frey's termination of Venture's lease.

For the reasons set forth in the *Oreck* line of cases, Giallombardo's complaints about Venture do not support an inference of illegal agreement. There was no evidence that Giallombardo complained about anything other than Venture's violation of the spacing policy and the threat of Distribution's committing to buy Venture's gas before it had honored its commitment to purchase Flint's gas. These are normal business concerns which in no way point to conspiracy.

Venture has argued that this Court should consider, as evidence of conspiracy, Distribution's failure to make limited commitments to purchase gas drilled by Venture when pipeline capacity was increased or on such terms as the Public Service Commission would approve. There is no evidence, however, that Venture ever sought such commitments. Venture further relies on evidence which it contends demonstrates the pretextual nature of Distribution's statements that its decisions about Venture were taken because of inadequate pipeline capacity and because of its pending application before the Public Service Commission. This Court has explicitly addressed the inadequacy of such evidence in *Moore Drug*, holding that the advancement of pretextual reasons for the type of conduct at issue in this case does not by itself justify the inference that the conduct was the result of a conspiracy. The most that the jury could permissibly infer from such evidence is that Distribution had some reason other than its pipeline capacity or its Public Service Commission application for its actions.

■ In sum, there was no evidence in this case that would permit the inference that Distribution and Flint had "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *American Tobacco Co., supra*, 328 U.S. at 810, 66 S.Ct. at 1139. In reaching this conclusion, we recognize that conspirators usually act covertly and that if we require too great a degree of proof, we may weaken the effect of the Sherman Act and thwart its beneficial purposes. But one who alleges that he is a victim of an antitrust conspiracy and seeks to impose the heavy sanctions of the Sherman Act upon the accused, must show more than the existence of a climate in which such a conspiracy may have been formed.[5]

5. As discussed above, we do not reach the damage issues raised by the appellants. We note, however, that Venture was simply one of Waytena's many natural gas investments, that it was a highly speculative operation, and that it had engaged in comparatively little activity with a limited expenditure of funds during the few months of its participation in the western

In this regard, it is not the quantity of the plaintiff's evidence which is important, but its qualitative value in demonstrating that the parties actually entered into a conspiracy. As we have noted above, evidence regarding the relationship of these parties to each other, the actions and decisions alleged to constitute illegal activity in this case, and the history of the western New York gas production industry, provide a substantially weaker basis for an inference of conspiracy than was present in either *Oreck* or *Moore Drug*. Even taken as a whole, the evidence points with at least as much force toward unilateral actions by Distribution as toward conspiracy, and a jury would have to engage in impermissible speculation to reach the latter conclusion. The evidence was therefore insufficient as a matter of law to support a finding of conspiracy.

The judgment of the lower court is reversed and the case is remanded for the entry of judgment in favor of the defendants.

New York gas production industry. In this context, it is not unjust to require that Venture show more than conjecture and surmise to reap the windfall of a treble damage award of $1,500,000 plus legal fees.