Mendel SCHWIMMER d/b/a Supersonic Electronics Co., Plaintiff-Appellee,

v.

SONY CORPORATION OF AMERICA, Defendant-Appellant.

No. 75, Docket 81–7135.

United States Court of Appeals, Second Circuit.

Argued Sept. 21, 1981.

Decided May 3, 1982.

As Modified June 30, 1982.

See also D.C., 471 F.Supp. 793 and 2 Cir., 637 F.2d 41.

* The Honorable T. F. Gilroy Daly, of the United States District Court for the District of Con-

I. Scott Bass, New York City (Steven R. Trost, Lawrence H. Roth, Irving L. Wiesen, Bass, Ullman & Lustigman, New York City, on the brief), for plaintiff-appellee.

Joshua Greenberg, New York City (Randolph S. Sherman, Ira S. Sacks, Kaye, Scholer, Fierman, Hays & Handler, New York City, Asa D. Sokolow, Douglas N. Gordon, Brian G. Lustbader, Rosenman Colin Freund Lewis & Cohen, New York City, on the brief), for defendant-appellant.

Before NEWMAN and KEARSE, Circuit Judges, and DALY,* District Judge.

KEARSE, Circuit Judge.

Defendant Sony Corporation of America ("Sonam") appeals from a judgment of the

necticut, sitting by designation.

United States District Court for the Eastern District of New York, Eugene H. Nickerson, *Judge*, entered upon a jury verdict in favor of plaintiff Mendel Schwimmer ("Schwimmer") d/b/a Supersonic Electronics Co. ("Supersonic") in the amount of $675,000 before trebling and exclusive of attorney's fees, for Sonam's termination of Supersonic as a dealer in Sony products, pursuant to a conspiracy between Sonam and certain of its other dealers and distributors in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1976). On appeal Sonam's principal argument is that the district court erred in denying Sonam's motion pursuant to Fed.R.Civ.P. 50(b) for judgment notwithstanding the verdict. We agree with Sonam that there was insufficient evidence to support an inference that the alleged conspiracy existed, and we therefore reverse the judgment.

## I. FACTS

From January 1976 until April 1977, Supersonic was a dealer in Sony electronic consumer products such as radios, tape recorders, and color television sets. The gist of Supersonic's claim is that Sonam, pursuant to a general conspiracy between it and its customers to restrain trade in Sony consumer products, terminated Supersonic's dealership because Supersonic sold such products to retailers in geographical areas other than the New York metropolitan area where Supersonic was located (a practice known as "transshipping") and sold at prices lower than those offered by other Sony customers. Viewed in the light most favorable to Supersonic, the party that prevailed at trial, *see* Part II, *infra*, the evidence revealed the following events leading to Supersonic's termination.

## A. *Sonam's Distribution System*

Sonam is the wholly-owned United States sales subsidiary of Sony Corporation, a Japanese manufacturer of electronic products. At the times pertinent to this case, Sonam marketed its consumer products in essentially two ways. In most areas of the United States, Sonam sold to independent distributors, who sold at wholesale rates to retail dealers, who sold to consumers. In the larger metropolitan areas, including the New York City area, Sonam sold its products directly to the dealers. Sonam also sold directly to "national accounts," which were dealers with retail operations in a number of different geographical areas; these included certain department stores and certain dealers allied as joint buying groups.

Sonam did not grant exclusive distributorships or dealerships within given geographical areas. Rather it assigned each distributor a primary area of responsibility, although distributors remained free to operate outside of their primary areas. During the pertinent period, Sonam placed no contractual restrictions on the rights of its dealers to sell in any area.[1] Prior to April 1975, Sonam had retail price lists that it provided to dealers, and it took advantage of "Fair Trade" laws[2] to require dealers to sell at the prescribed prices. In April 1975, with the abolition of Fair Trade laws in the offing, *see* note 2, *supra*, Sonam established instead "suggested" retail price lists and ceased to insist on adherence to the listed retail prices.

The prices at which Sonam sold its products to dealers were subject to a number of

---

**1.** In January 1978 Sonam adopted new dealership agreements that required each dealer to sell only to consumers and to sell only from the location at which it was operating. In substance the new agreements prohibited transshipping.

**2.** Fair Trade laws, such as N.Y.Gen.Bus.Law § 369–a (McKinney 1968), allowed manufacturers of brand named products to require their dealers and distributors to agree to resell the products at prices set by the manufacturer. Until 1975, a proviso of § 1 of the Sherman Act

exempted such Fair Trade agreements from that section's general prohibition of contracts "in restraint of trade" if the resale of the product was to take place in a state with a Fair Trade law and the contract conformed to that Fair Trade law. Congress repealed this proviso in late 1975. Consumer Goods Pricing Act of 1975, Pub.Law 94–145, 89 Stat. 801. Many Fair Trade states, including New York, repealed their Fair Trade laws just before Congress deleted the § 1 proviso. *See* Act of May 5, 1975, 1975 N.Y.Laws ch. 65 (repeal effective ninety days after date of passage).

possible discounts. There were various discounts related to the timing of the dealer's payments, and there were volume discounts in varying percentages for bulk purchases in individual orders and for cumulative purchases through the course of a year.[3] When totaled, those discounts could amount to about 15 percent of Sonam's stated prices to dealers. The availability of such discounts made it possible for a high-volume dealer who bought directly from Sonam both to charge retail prices substantially below the prices charged by dealers who adhered to Sonam's suggested list prices, and to resell to other retail dealers (i.e., to transship) at lower prices than those normally charged to retailers by Sonam or its distributors. The strong consumer demand for Sony products and the elimination of Sonam's Fair Trade practices in the spring of 1975 led a number of Sony dealers to engage in transshipping and price cutting, and Sonam began to receive complaints of such activities from other distributors and retailers.

All Sonam witnesses who had received such complaints testified that Sonam's response to the complaints had been that Sonam could not do anything to curtail the price cutting or the transshipping. Various witnesses adverted to customer complaints only in general terms; the most detailed testimony came from former Sonam executive Joseph Sadowy, who, in the spring of 1977, had been discharged by Sonam on the asserted ground of his role in the events that immediately preceded the termination of Supersonic's dealership. Sadowy, who had been general manager of Sonam's eastern region in the mid-1970's, described Sonam conversations during that period with officials of Macy's, Abraham & Straus ("A&S"), and Gimbels. With respect to a discussion with a Macy's vice president, Sadowy testified:

The one conversation that I remember is he was complaining about the transshipping. He was complaining about the price cutting. And the end result of this discussion at that time, Macy's decided to bring out their own brand. And they called it Super Macy. That was as a result of this price cutting that was going on in the market. So Macy's said—and I believe Bamberger's sells the same line. That was basically the whole conversation.

(Tr. 161.) As to A&S, Sadowy testified that its vice president Kagan "was very upset because of the price cutting. And he wanted to make his full markup. And just that kind of conversation." (Tr. 162.) According to Sadowy, Sonam vice president Raymond Steiner "tried to assure [Kagan] we were working on programs to help him out at that meeting and that there were going to be changes in our program to help reduce the transshipping and price cutting. We were going to have some stability." (Id.)[4] When Sadowy and two other Sonam executives met again with Kagan and the president of A&S, and Kagan reiterated his dissatisfaction, the Sonam employees did not respond. Sadowy stated that there were no further meetings with A&S because A&S "stopped buying Sony's products at that point." (Tr. 165.) Sadowy also testified that he had discussed transshipping with a representative of Gimbels along the same lines. According to Harvey Schein, Sonam's president from 1972 until the summer of 1977, after Sonam told Gimbels that there was nothing Sonam could do about the complaints, Gimbels too ceased selling Sony products.

Supersonic began selling Sony products in January 1976, pursuant to a dealership agreement signed in December 1975. Su-

---

3. The formation of joint buying groups enabled dealers to take greater advantage of benefits accorded to high-volume purchasers.

4. This is the only testimony indicating that a Sonam executive responded, even in the general way described, that Sonam could or would take any action to reduce transshipping or price cutting. But see note 12 infra. Sadowy's version of Steiner's statement was not con-

firmed by any other participant in the conversation. (Steiner died prior to the taking of any depositions in this action.) Sadowy's description of further conversations with A&S, see text following this note, and A&S's actions thereafter negative any inference that the general "assur[ances]" attributed to Steiner signified, or led to, any agreement between Sonam and A&S on the elimination of transshipping.

personic, which was located in New York, quickly began selling large volumes of Sony products at discounted prices to other retailers in Florida, Georgia, Texas, and Philadelphia. In its first year under the contract Supersonic's purchases from Sonam amounted to more than $3 million. While Sonam customers complained about transshipping generally, none of their complaints mentioned Supersonic specifically.[5]

## B. Sonam's Cooperative Advertising Program and the "Computer Cast" Frauds

In order to encourage its dealers to run local advertising of Sony products, Sonam maintained a "cooperative advertising" program. Under this program Sonam would in effect pay the bulk of the cost of the local advertising by granting to the advertising dealer a credit for 75% of the cost, up to a maximum of 4% of the dealer's purchases from Sonam for the year.

In April 1977, Sonam began an investigation into the cooperative advertising claims of several New York area Sony dealers who were known to be transshippers. The investigation was ordered by Sonam president Schein on the premise that a dealer who (a) shipped out of his own area, and (b) sold chiefly to other retailers, had no real need to run local advertising in consumer-oriented media. Schein testified as follows:

> I seem to recall that there was a meeting at which we were talking about coop[erative] advertising and that we were spending literally tens of millions of dollars a year on coop[erative] advertising and there may have arisen the subject of transshippers and the idea that a transshipper buys a product in one place and sells it in another place and that the question came up that if he did not sell

his product where he purchased it then how could he be taking advertising for the product where he purchased it and there I may have said . . . "If that's the case, send in our auditors to find out whether these people were indeed advertising and if they were not advertising and they were therefore charging us for something which never existed, then we should seek to get our money back because otherwise we're being cheated, being defrauded."

(Tr. 890.) Though the initial focus had been on transshippers, as those least in need of local advertising, Schein testified that his plan had been, if the initial audits confirmed his suspicions, to extend the audits "through to the entire roster." (Tr. 898.) And in fact the audit was eventually extended to all dealers in the eastern region and to all national accounts.

The audit, which consisted of, *inter alia*, communication by Sonam with representatives of the media that were supposed to have run the advertising, disclosed that a number of Sony dealers had indeed submitted claims for advertising that had never been run. In particular, Sonam quickly discovered that nine dealers, at least seven of which were transshippers,[6] had submitted, through a company called Computer Cast, false claims to Sonam totaling nearly $500,000 for commercials supposedly carried on two New York radio stations. The audit revealed that the commercials had never been aired and that the radio station invoices submitted to Sonam by Computer Cast in support of the claims had been forged. One of the "Computer Cast Nine" was Supersonic, which had been granted credits totaling more than $54,000.[7] All of the credits to these nine dealers had been approved by Sadowy. Most of the nine dealers had re-

---

**5.** Supersonic disclaims any contention that Sonam and its customers conspired to terminate Supersonic: "This case did not involve a conspiracy to terminate Supersonic; the termination of Supersonic was simply one act by [Sonam] in furtherance of the general conspiracy." (Supersonic Brief at 1.)

**6.** At trial the parties stipulated that "seven of [the nine Computer Cast] dealers were transshippers of Sony brand products." Sadowy testified that all nine were transshippers, seven of

them large transshippers and two smaller dealers that did some transshipping.

**7.** The nine dealers had been credited with the following amounts:

| | |
|---|---|
| Alkit Camera Shops | $ 3,172.50 |
| Bryce Audio | 223,444.37 |
| Grand Central Radio | 8,698.33 |
| Hampton Sales | 52,887.24 |
| Pioneer Sales and Electronics | 68,961.88 |
| Supersonic | 54,133.50 |
| Trader Horn | 39,974.25 |
| Ultralinear Sound (Crazy Eddy) | 13,603.50 |
| Vendome Trading | 15,227.50 |

tained Computer Cast at the suggestion or insistence of Sadowy or his assistant Janet Melchiorre.

The audit had been commenced while Sadowy was on a week-long business trip to Dallas, and, with respect to the claims submitted through Computer Cast, Sonam had sent each dealer's claim documentation to the radio station in question, requesting verification that the commercials had been aired. When Sadowy learned of Sonam's inquiries, he arranged, from Dallas, to have Melchiorre send letters in his name to the radio stations, asking them to return the documentation immediately ("Thank you for returning the papers that were sent to you in error. These documents have no bearing or relationship to your station.") Shortly after Sadowy's return to New York he was questioned by Sonam attorneys, and he and Melchiorre were suspended from work and were eventually fired.

On April 26, 1977, a few days after Sadowy's suspension, Sonam sent a letter to each of the nine dealers that had submitted claims through Computer Cast, informing each that Sonam had discovered a specified total of false claims submitted by that dealer. In each letter Sonam demanded that repayment be made by 5 p.m. on the following day, and that each dealer meet with Sonam within three days to "explain how such improper claims for payment could have been submitted by you." Sonam also stated that after hearing the explanation it would decide what action to take in addition to demanding reimbursement.

Each dealer met with Sonam. Most, if not all, said they had not known their claims to be false. Sonam advised each dealer that it was suspending sales to the dealer pending investigations. Thereafter Sonam informed each dealer by letter that Sonam would permit the resumption of purchases if the dealer repaid the amount wrongly credited to it and furnished Sonam's counsel with an affidavit describing the dealer's involvement with Computer Cast, and if Sonam's counsel concluded that the dealer had not attempted to defraud the company. Sonam explained the purpose of its demand as follows:

Sony has adopted the above procedure applicable to all dealers who, to its knowledge, received such improper co-op credits, as the most equitable way to fulfill its obligation to itself as well as its other customers not to sell to those who have attempted to defraud Sony and thereby obtain an unfair advantage over its other customers.

Eight of the dealers agreed to Sonam's terms in May or early June 1977. By mid-June seven cf these eight dealers had provided the requested affidavits and either made repayments or set up a schedule for repayment. Sonam shortly resumed selling to these seven dealers.

The only dealer that refused from the outset to make repayment or to give an affidavit was Supersonic. Supersonic never changed its position and in the absence of repayment and an affidavit, Sonam did not reinstate it. Supersonic remained suspended until its dealership agreement expired at the end of 1977.

## C. The Present Lawsuit

On June 17, 1977, after the reinstatement of the seven dealers who had given affidavits and agreed to make repayments, Schwimmer commenced the present treble damage action, alleging principally that Sonam's termination of the Supersonic dealership was the result of a conspiracy among Sonam and its customers to discourage transshipping, in violation of § 1 of the Sherman Act.[8] In addition to the evidence

---

**8.** Schwimmer asserted other claims that were dismissed on summary judgment. 471 F.Supp. 793. These included principally his claim against Sony Corporation under §§ 2(a), (d), and (e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (d), and (e) (1976), see *Schwimmer v. Sony Corp. of America*, 637 F.2d 41 (2d Cir. 1980) (affirming summary judgment), and claims that Sonam had engaged in unfair competition and unfair business practices in violation of New York law.

Sonam counterclaimed against Schwimmer for his refusal to pay for goods purchased, and was granted summary judgment for $54,133.50, the amount of false advertising credits that Supersonic had refused to repay. This judgment was affirmed on appeal. *Id.*

described above, Schwimmer introduced evidence, discussed in part II, *infra*, of Sonam's treatment of customers other than Supersonic and the Computer Cast Nine.

At the close of the evidence the jury was asked to return a special verdict, answering six questions. The first four, which related to the issue of Sonam's liability, were as follows:

1. In the years of 1976 and 1977, did defendant engage in a combination or conspiracy with certain of its dealers and distributors to discourage transshipping and discounting?

2. If the answer to question 1 is yes, did this combination or conspiracy restrain interstate trade or commerce?

3. If the answer to questions 1 and 2 are yes, was this restraint unreasonable?

4. If the answers to questions 1, 2 and 3 are yes, was plaintiff's dealership terminated because of this conspiracy?

The jury answered each question in the affirmative, and went on to find that Schwimmer had been proximately damaged in his business or property in the amount of $675,000.

Sonam moved pursuant to Fed.R.Civ.P. 50(b) for judgment notwithstanding the verdict ("n. o. v.")[9] on the ground, *inter alia*, that the evidence was insufficient to support a verdict that Supersonic had been terminated pursuant to an unlawful conspiracy. In an opinion reported at 1980–81 Trade Cas. ¶ 63,766 (CCH) (E.D.N.Y.1981), the district court denied the motion. Focusing principally on the question of causation, rather than on whether a conspiracy had been proven, the court stated that although there was evidence from which the jury could have concluded that Supersonic had been suspended solely because of its failure to repay the Computer Cast credits rather than for any reason relating to Supersonic's transshipments,

> there was also adequate proof from which the jury could have decided that the suspensions, including that of Supersonic, had a second, unlawful, motive. There was evidence, viewed in a light most fa-

vorable to Supersonic, from which the jury could have concluded the following. [Sonam] received from various of its major customers, characteristically department stores, complaints about some dealers' practice of transshipping and discounting. Some [Sonam] executives, while they knew that an outright elimination of this practice would violate the law and would perhaps be economically unwise, sought to discourage transshipping. Some such tentative steps were taken. In the early part of 1977 [Sonam], though it had not uniformly enforced its cooperative advertising program in the past, chose to enforce it against nine transshippers whom it suspended for a period of up to two months for making claims for advertising which did not run.

> [Sonam] had not previously suspended a customer for making such advertising claims. Nor had it required any customer to submit affidavits concerning its role in the making of such claims. To be sure, as [Sonam] claims, the nine suspensions were made where it appeared that all nine had dealt with a single advertising agency and that [Sonam] employees were involved in the scheme. But the jury was not required to infer that this was the only reason that [Sonam] decided to institute the investigation and the suspensions while not taking similar action in other instances where advertising had not been shown to have run. The jury could also infer from the distaste with which [Sonam] officials viewed transshipping and from their previous actions and their words (in particular those taped by Sadowy) that the suspensions were a signal and a warning to transshippers and a means of putting pressure upon them.

*Id.* at 78,088. The court entered judgment in favor of Schwimmer in the sum of $2,025,000, after trebling, with the amount of attorney's fees to be set at a later time. This appeal followed.

## II. DISCUSSION

The function of an appellate court reviewing the denial of a judgment n. o. v. is essentially the same as the function of

---

9. At the close of the evidence Sonam had moved unsuccessfully for a directed verdict.

the trial court in ruling on the judgment n. o. v. motion. Both courts must determine whether the evidence, viewed in the light most favorable to the party that secured the verdict, was sufficient to allow a reasonable juror to arrive at the verdict rendered. *H. L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935 (2d Cir. 1981); 5A Moore's Federal Practice ¶ 50.07[2] (2d ed. 1981). As we stated recently in the *Eli Lilly* case,

> we must determine, without weighing the credibility of the evidence but viewing it most favorably to the plaintiff, whether "there can be but one reasonable conclusion as to the proper judgment." 5A Moore's Federal Practice Par. 50.07[2] (2d ed. 1980); see also *Beech Cinema v. Twentieth Century-Fox Film*, 622 F.2d 1106, 1107–08 (2d Cir. 1980). To do otherwise would be impermissibly to substitute our view of the evidence for that of the jury.
>
> "If, however, after viewing all the evidence most favorably to plaintiff, we cannot say that the jury could reasonably have returned the verdict in his favor, our duty is to reverse the judgment below. The jury's role as the finder of fact does not entitle it to return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial." *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042, (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).

662 F.2d at 940–41. Our review of the record in the present case convinces us that, even after drawing all permissible inferences in favor of Schwimmer, there was insufficient evidence from which the jury could rationally conclude that Sonam had entered into an unlawful conspiracy.[10]

The starting point for proof of a violation of § 1 of the Sherman Act is evidence that the defendant acted as part of a "contract, combination . . ., or conspiracy."[11] Other elements aside, it is clear that the essence of a § 1 violation is a combination or agreement between two or more persons. Proof of joint or concerted action is required; proof of unilateral action does not suffice. As we stated in *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102 (2d Cir. 1975), § 1 of the Sherman Act

> is directed only at joint action. . . . It does not prohibit independent business actions and decisions. A person still has the right to refuse to do business with another, provided he acts independently and not pursuant to an unlawful understanding, tacit or expressed. Fundamental then to any § 1 claim is the finding of an agreement, express or otherwise, between two or more persons.

*Id.* at 108–09. In *H. L. Moore Drug Exchange v. Eli Lilly & Co., supra,* in which we reversed the district court's denial of judgment n. o. v. where the plaintiff had obtained a favorable verdict on its claim that Lilly's termination of plaintiff as a wholesaler violated § 1, we set forth in some detail the requirements for proving a conspiracy within the meaning of § 1:

> A unilateral refusal by Lilly to deal with a wholesaler, absent proof that it was pursuant to a conspiracy, does not violate § 1 of the Sherman Act. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Oreck v. Whirlpool Corp.*, 639 F.2d 75 (2d cir. 1980). Moore could prevail only if it proved that its termination stemmed from "a contract, combination ' or conspiracy" between Lilly and certain of its wholesalers. *Oreck, supra,* at 79.

---

**10.** Sonam also argues that, assuming the existence of a conspiracy to eliminate transshipping, Supersonic failed to prove that his termination was caused by that conspiracy; and it challenges certain evidentiary rulings and instructions of the trial court. In light of our conclusion that there was not sufficient evidence to prove the existence of a conspiracy, we need not reach Sonam's other contentions.

**11.** Section 1 of the Sherman Act, 15 U.S.C. § 1, reads in relevant part as follows:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

Conspiracies, of course, are rarely evidenced by explicit agreements, but must almost always be proven by "inferences that may be fairly drawn from the behavior of the alleged conspirators." *Michelman v. Clark-Schwebel Fiber Glass Corp.*, supra, 534 F.2d at 1043. At a minimum, however, "the circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

Although the evidence warranting an inference of concerted action will vary from case to case, courts have laid down fairly specific guidelines about what will be considered insufficient as a matter of law to warrant the inference of a conspiracy. Thus "[a] mere showing of close relations or frequent meetings between the alleged conspirators ... will not sustain a plaintiff's burden absent evidence which would permit the inference that these close ties led to an illegal agreement." *Oreck, supra*, 639 F.2d at 79. Nor does a manufacturer's mere receipt of complaints from its wholesalers or agents who compete with the plaintiff, or its consultation with such other competing wholesalers, standing alone, support a finding of conspiracy with them. *Id.* at 80; *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 395 (2d Cir. 1980); *Modern Home Institute v. Hartford Accident & Indemnity Co.*, 513 F.2d 102 (2d Cir. 1975); *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105 (3d Cir. 1980), cert. denied, [451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300]. Even where a termination follows the receipt of complaints from wholesalers or agents, there is no basis for inferring the existence of concerted action, absent some other evidence of a tacit understanding or agreement with them. *Modern Home Institute v. Hartford, supra; Edward J. Sweeney & Sons v. Texaco, supra; A. G. Rogers Co. v. Merck & Co.*, 498 F.Supp. 5 (E.D.Tenn. 1980).

662 F.2d at 941.

■■ In the present case, even recognizing that the proof as to a conspiracy will usually be circumstantial, we find no evidence in the record from which the jury could reasonably have inferred that in 1976 or 1977 Sonam and any of its customers entered into an agreement, either express or tacit, to discourage transshipping of Sony consumer products. There was ample proof that Sonam's dealers complained about transshipping, but such complaints do not suffice to support an inference of agreement. *H. L. Moore Drug Exchange v. Eli Lilly & Co., supra.* There was also evidence that some, although not all, Sonam executives disliked transshipping and discussed ways to reduce it; but collaborative action between a corporation and its employees, or among employees within a corporation, is not regarded as joint action within the meaning of § 1. *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911 (5th Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953); *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879 (3d Cir.), cert. denied, —— U.S. ——, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

The facts of record as to what Sonam said to complaining customers, what complaining customers did following the Sonam responses, and what Sonam did with respect to transshipping dealers, are inconsistent with any inference that there was an agreement to discourage transshipping. As to individual complaining customers, the evidence was that Sonam responded that it could do nothing to restrict transshipping.[12]

---

12. Supersonic also points to a 1976 letter that it contends demonstrates that Sonam "actively followed through on customer complaints to ascertain the source of, and report back to the customer about," transshipping. (Supersonic Brief at 9.) The letter, from Sonam national sales manager Vernon Brisson, was sent to a Texas distributor who had complained of sales in Houston by a New York shipper and a Los Angeles catalog company, and stated as follows:

> This is to acknowledge your phone call and to let you know that we will try to help you in every possible way with the marketing problems you are experiencing.

*See* note 4, *supra,* and surrounding text. The subsequent actions of several of the complainers provide strong confirmation that this had been Sonam's response. In the wake of Sonam's statements that it could not take action with respect to price cutting or transshipping, Gimbels ceased to buy Sony products. A&S did likewise. And Macy's decided to bring out its own brand. Thus, the actions of the three Sony customers whose conversations with Sonam were described in greatest detail at trial indicate that no agreement to discourage transshipping was reached.

Sonam's treatment of dealers who transshipped similarly is inconsistent with the notion that Sonam had agreed to discourage transshipping. With the exception of Supersonic and the other dealer who eventually refused to repay the advertising credits gained through Computer Cast, there was no evidence that Sonam had ever terminated the dealership of any transshipper of consumer products.[13] As to the Computer Cast affair, there was no evidence that the suggestion for an audit of cooperative advertising claims came from dealers who complained about transshipping. The evidence was that Schein ordered the audit to determine whether the company was being bilked by dealers who did not need to advertise. And, indeed, the net cast by the audit caught faulty claims by nontransshippers as well as transshippers. Sonam's actions with respect to the Computer Cast Nine in particular seriously undercut the premise that Sonam had agreed with its complaining dealers to attempt to discourage transshipping. Of the Computer Cast Nine, seven were companies that did large amounts of transshipping. All nine companies were given the opportunity to remain Sony dealers, seven of them took advantage of that opportunity, and Sonam immediately resumed selling to those seven. There was no evidence that Sonam conditioned its treatment of these dealers on a reduction of their transshipping activities, or that it even mentioned transshipping. An official of Hampton Sales, a major transshipper, testified that the subject of transshipping was never raised.

Notwithstanding these facts, Supersonic contends that an agreement between Sonam and its customers to discourage transshipping can be inferred from three other circumstances: (1) that Sonam restricted credit lines in order to reduce transshipping, (2) that Sonam provided certain products only to nontransshippers, and (3) that other Sonam customers who submitted faulty advertising claims received better treatment than Supersonic. A review of the record reveals that some of these propositions fail for lack of factual predicate and that none of the circumstances proven by Supersonic showed the existence of the alleged general conspiracy to discourage transshipping.

---

If you have a copy of the Olympic Sales Catalog, would you please forward it to my attention—I would like to review this catalog and discuss it with our people in Los Angeles.
As for the account in Yonders [*sic*], N.Y., who is supposedly shipping to the Texas area, I have been unable to gather any information on this account. To the best of my knowledge, we do not sell this particular account.
We shall continue to exert all effort to aid you to improve your market conditions.
So far as appears from the record, Brisson merely asked other Sonam employees whether Sonam was selling to the two companies mentioned; he determined that Sonam did not sell to the New York shipper and did sell to the Los Angeles catalog company; he did not inquire whether there were other Sonam customers shipping into the Houston area; and he made no further inquiries as to the two in question, took no action with respect to either, and gave the matter no further thought. We are unable to regard the Brisson letter, either standing on its own or in the context of the record as a whole, as a sufficient basis for inferring the existence of the general conspiracy to discourage transshipping as alleged by Supersonic.

13. In *Eiberger v. Sony Corp. of America,* 622 F.2d 1068 (2d Cir. 1980), which involved Sony business products rather than the consumer products at issue here, Sonam had unlawfully terminated its contract with a business products dealer. The termination in *Eiberger* had been part of Sonam's implementation and enforcement of a warranty fee system embodied in Sonam's 1975 contracts with all its business product dealers. There was no question that there existed between Sonam and those dealers pertinent contracts within the meaning of § 1.

Supersonic's argument that Sonam sought to control transshipping by restricting transshippers' credit lines was based on the fact that Supersonic was allowed a credit line of only $8,000, and on a taped conversation between Sadowy and Sonam's regional credit manager Thomas Lisanti in which Lisanti stated that he thought Sonam management wanted to eliminate transshipping, although it did not want to give up the sales volume, and that he had told management that he was slowing down the transshipping by controlling the credit lines. The record, however, belies the inferences suggested by Supersonic. First, although Supersonic's own credit line of $8,000 was small in comparison to its more than $3,000,000 of purchases, the evidence was that the only financial statement Supersonic ever furnished to Sonam showed that Supersonic's net worth was only $20,000. As Schwimmer himself testified, "[i]t was a weak financial statement." (Tr. 615.) Further, the record shows that the credit lines of the other major transshippers were not, in fact, kept low. For example, of Sonam's ten eastern region dealers with the highest volumes of purchases in 1976, seven, including Supersonic, were transshippers, and an eighth was a buying group that included transshippers. The six transshippers other than Supersonic, and the buying group that included transshippers, all had credit lines between $200,000 and $300,000. In fact, at $300,000, Hampton Sales, a major transshipper, had the second highest credit line of all major eastern region dealers as of January 31, 1976; and as of January 31, 1977, Hampton's credit line was $400,000, by far the highest of all such dealers.

Supersonic's contention that Sonam made certain products available only to nontransshipping customers is similarly flawed. Supersonic places principal reliance on the fact that in late 1976 Sonam introduced two slightly modified models of color television sets, containing several features (such as tone control, a vinyl rosewood veneer on wood cabinet, and a 5-inch speaker) not available on standard Sony sets. These two models were offered only to about a dozen department stores or buying groups for the first ninety days following their introduction, and were intended to "give each region an opportunity to present longer mark-up color TV models to profit-oriented Sony dealers." The impetus for Sonam's introduction of the two "sheltered models" was requests from these customers for products that they could sell without erosion of their profit margins. As it happened, these customers did not sell sufficient numbers of the sheltered models, and the two models were soon made available to all Sonam customers. Even the initial actions by Sonam, however, while obviously intended to bolster the ability of certain customers to sell the two models without impairment of their desired profits margins, do not support an inference that Sonam had agreed to curtail the activities of transshippers. First, even during the limited time that the sheltered models were sheltered, the flow of other Sony models to all transshippers appears to have continued unabated. Second, there is no evidence that any model of a Sony product was denied only to transshippers. And finally, among the dozen "favored" customers that received the sheltered models were at least two buying groups—Nationwide and National Appliance & Television Merchants ("NATM")—that included transshippers. Thus, the sheltered models were initially unavailable to most, but not all, non-transshippers, and to most, but not all, transshippers.

Finally, Supersonic sought to show that Sonam discriminated against the Computer Cast Nine, chiefly by requiring them, as a condition to their reinstatement, to provide affidavits that could be used against them, in order to give transshippers a "message" that transshipping would not be tolerated. (Supersonic Brief at 26.) Thus, Supersonic introduced evidence of a series of other events in which Sonam did not demand that the customers provide affidavits with regard to their submission of faulty advertising claims. A review of the record, however, reveals that these instances do not give rise to any inference that Sonam sought to discourage transshippers. The principle incidents were

(a) the submission in 1973–75 of claims by three dealers for ads allegedly run on

a Connecticut radio station that turned out to be in Kentucky; Sonam eventually collected for the credits it had granted, but not until two years after the frauds were first discovered; it imposed no penalty on the dealers and did not require affidavits; one of the three claimants, however, was Nationwide, a buying group whose largest member was a transshipper;

(b) Sonam's lax review in 1976 and early 1977 of the advertising claims of national accounts; some of these accounts, however, included transshippers; indeed, one of the few dealers mentioned by name was Brick Church, a transshipper;

(c) Sonam's treatment of submissions by Corner Distributors of advertising claims that the 1977 eastern region audit led Sonam to suspect were overstated; no one questioned the running of the ads, but only their cost; the amounts were eventually substantiated to Sonam's satisfaction, and no repayments or affidavits were required; Corner Distributors was a transshipper;

(d) the submission of unsupported or questionable claims by five national accounts, discovered in 1977 in the expanded phase of the eastern region audit that unearthed the Computer Cast frauds; Sonam demanded repayment and received it, in most cases immediately, but it did not require the dealers to submit affidavits; one of these accounts, however, was NATM, a buying group that included Newmark & Lewis and Brick Church, two transshippers;

(e) the customary deductions by department stores for advertising credits prior to their submission of documentation; Sonam did not approve of this practice and sent repayment requests that were not honored but were apparently rendered moot by the later forwarding of documentation; and

(f) Sonam's discovery in 1979 of some $204,000 of false advertising claims submitted in the early 1970's by Hampton Sales (one of the Computer Cast Nine); in 1979 Sonam did not suspend sales to Hampton and neither demanded repayment nor requested affidavits; Sonam

and Hampton officials testified that these newly-discovered false claims had been submitted by the previous owners of Hampton prior to 1975 and that insistence on repayment in 1979 would have forced the company into bankruptcy; in 1977 Hampton had promptly repaid the $52,887 in credits obtained through Computer Cast and given an affidavit, and had promptly been permitted to resume purchases of Sony products; Hampton was a large transshipper.

These instances hardly suggest, either independently or in comparison with the Computer Cast affair, that Sonam issued a "message" to discourage transshippers. In none of the above instances did Sonam treat any transshipper worse than a nontransshipper. Sonam required no affidavits, regardless of whether the offending customer was a transshipper or a nontransshipper. In no instance did it require repayment of amounts due it from a transshipper when it did not impose such a requirement on a nontransshipper. The only instance in which Sonam decided to forego repayment was one in which the false claims had come from a major transshipper. Sonam's treatment of the Computer Cast Nine was indeed more rigorous than its treatment of customers submitting other faulty claims; but since the less demanding responses were directed toward all such customers, including those who were transshippers, none of the evidence creates any inference that Sonam and its customers had agreed that Sonam would discourage the activities of transshippers.

We conclude that neither the evidence adduced as to Sonam's communications with its dealers on the subject of transshipping, nor any other evidence in the record, taken independently or as a whole, provided a reasonable basis for an inference that in 1976 or 1977 Sonam and its dealers had entered into an agreement to discourage transshipping. Since the requisite proof of concerted action within the meaning of § 1 was lacking, the district court should have granted judgment for Sonam notwithstanding the jury's verdict.

## CONCLUSION

The judgment of the lower court is reversed and the cause is remanded for the entry of judgment in favor of the defendant.