BORDEN, INC., Alfred S. Cummin, A.S. D'Amato, Ann Forrestal and W. Donald Nyland as Executors of the Estate of Frank V. Forrestal, Deceased, Robert Gutheil, Jon Hettinger, David Kelly, Walter Kocher, Augustine Marusi, Ruth Marusi, Allan Miller, Bernard Nemtzow, Herman Peed, Edward I. Piernick, Joseph Saggese, Eugene Sullivan and Gloria Sullivan, Plaintiffs,

v.

SPOOR BEHRINS CAMPBELL & YOUNG, INC.; First Interstate Bank, Ltd.; First Interstate Investment Services, Inc.; Kenneth R. Behrins, T. Richard Spoor; Robert L. Campbell and Michael D. Young, Defendants.

No. 89 Civ. 8645 (WCC).

United States District Court,
S.D. New York.

July 30, 1993.

As Amended Aug. 30, 1993.

Bressler, Amery & Ross, New York City, for plaintiffs (Bernard Bressler, David J. Olesker, Daniel Baldwin, and Noel C. Crowley, of counsel).

Sullivan & Cromwell, New York City, for defendants (Philip L. Graham, Jr., John B. Reid–Dodick, and Lisa J. Laplace, of counsel).

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Plaintiffs Borden, Inc., et al. bring this action against Spoor Behrins Campbell & Young, Inc. ("SBCY"), each of SBCY's principals (T. Richard Spoor, Kenneth R. Behrins, Robert L. Campbell, and Michael D. Young), First Interstate Investment Services, Inc. ("FIIS"), and First Interstate Bank, Ltd. ("FIB") for violations of section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5 promulgated thereunder;[1] violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; and for numerous common law violations. The action is presently before the Court on the parties' cross motions for partial summary judgment. The motions are denied.

### BACKGROUND

SBCY is a personal financial planning boutique established in 1978 which was acquired by FIB, through FIB's subsidiary FIIS, on May 25, 1983, and operated as a wholly owned subsidiary from that date until the end of 1987. On February 2, 1979, Borden, Inc. ("Borden") retained SBCY to provide financial advice to a selected group of its executives ("the individual plaintiffs") for a period of one year, and the contract was renewed annually through the end of 1985. During the course of this relationship, SBCY recommended that these Borden executives purchase interests in a number of limited partnerships as tax shelters. The gravamen of the complaint is that by failing to disclose payments SBCY received from each of these partnerships, defendants fraudulently induced 51 purchases by the individual plaintiffs of interests in 20 separate limited partnerships.

In support of the instant motions, plaintiffs argue that the undisputed facts show that SBCY received undisclosed commissions on 40 of their purchases in 15 of the limited partnership at issue,[2] and defendants FIB and FIIS ("the FIB defendants") argue that they can not be held liable for SBCY's alleged fraudulent behavior that occurred prior to their acquisition of SBCY. Both summary judgment motions are denied.

### DISCUSSION

*I. Plaintiffs' Motion For Partial Summary Judgment*

■ Plaintiffs seek partial summary judgment on the following claims: Rule 10b–5, (direct, aiding and abetting, and control person liability) (Counts I, II, XVI), RICO (Counts XIV, XV), common law fraud (Count IV), breach of fiduciary duty (Count VIII); aiding and abetting common law tort (Court XIII); breach of contract (Count VI); and imposition of a constructive trust (Count XII).[3] In urging us to grant their motion, plaintiffs argue that summary judgment in this case is particularly appropriate because if the case were to go to trial, the Court and not a jury would sit as the finder of fact. Pls.' Br. in Reply at 7. Contrary to plaintiffs' counsel's insinuation, the standard for granting summary judgment under Rule 56, Fed.R.Civ.P., remains the same whether a jury trial or a bench trial is anticipated. In either case summary judgment may be

---

1. Plaintiffs state claims for direct securities fraud, aiding and abetting, control person liability, and conspiracy to commit securities fraud.

2. Investments in the following limited partnerships are the subject of this motion: Holiday Assoc. of Marathon Key ("Marathon Key"); Triangle Professional Assoc. ("Triangle"); Holiday Assoc. of Mt. Vernon ("Mt. Vernon"); Holiday Assoc. of Lake Placid, Florida ("Lake Placid"); Transpac 1982–5, 1982–8; Transpac 1983–II; Historic Inns of Annapolis L.P. ("Historic Inns"); Mt. Ida Assoc. ("Mt. Ida"); Marbury Hotel Assoc. of Georgetown Ltd. ("Marbury"); Frick Building Investors. Ltd. ("Frick"); Holiday Assoc. of Sebring ("Sebring"); Market Street In-vestors L.P. ("Market St."); Searay Partners L.P. ("Searay"); 200 Main St., State Street ("200 Main St."); and T.W. Decisions. Pls.' Br. in Sup. at 5–6.

3. It is not completely clear from plaintiffs' submissions which claims are subject to this motion. The claims for negligence and receiving commercial bribes (Counts VII, X) appear in some, but not all, of plaintiffs' headings but are not analyzed in the argument, while the claim for aiding and abetting common law tort (Count XIII) is not mentioned in the headings but is analyzed in the argument. We address only those claims that plaintiffs analyze in their discussion.

granted only when, after drawing all reasonable inferences in favor of the party opposing the motion, no reasonable trier of fact could find for the nonmoving party. *Lund's, Inc. v. Chemical Bank,* 870 F.2d 840, 844 (2d Cir.1989). A summary judgment is not appropriate where material factual matters are in dispute. *National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 203 (2d Cir.1989). In support of their motion, plaintiffs contend that the undisputed facts demonstrate that SBCY received undisclosed commissions on the investments at issue. However, a review of the discovery materials submitted pursuant to this motion reveals that the matter of SBCY's alleged commissions is hotly contested. Since only the finder of fact at trial may weigh the credibility of contradictory evidence, the submissions of plaintiffs' counsel are not the stuff of which summary judgments are made.[4]

*A. There Is A Question Of Fact As To Whether SBCY Received Undisclosed Commissions.*

■ Defendants do not dispute that SBCY received fees from a number of the limited partnerships at issue for various types of services and, at trial, plaintiffs may contend that there was inadequate disclosure of each of these payments which created a conflict of interest for SBCY. However, plaintiffs' basis for the instant motion is much narrower. The evidence presented by plaintiffs shows only that, for the subset of investments at issue, SBCY did not disclose that it would receive any fees in the form of *commissions.* Plaintiffs unsuccessfully attempt to show from undisputed evidence that SBCY received *commissions* on these investments.

*1. SBCY's Disclosure Of Payments Received From The Partnerships At Issue.*

Pursuant to this motion the totality of SBCY's fee disclosure is not before the Court. Each of the 15 limited partnerships that are the subject of this motion was distributed pursuant to a private placement memorandum ("PPM"). However, out of these lengthy documents, plaintiffs submit only the two or three selected pages which discuss the commission, if any, that would be paid to purchasing representatives. As plaintiffs point out, none of the PPMs discloses commissions paid to SBCY.[5] In addition, purchasing questionnaires were executed by the individual plaintiffs in connection with a number of the limited partnerships at issue, and plaintiffs selectively cite these documents as well. The placement questionnaires for two of the limited partnerships are attached as exhibits to the motion, and plaintiffs' counsel purports to have copied into plaintiffs' brief selected paragraphs from the questionnaires for seven other limited partnerships.[6] Every excerpt plaintiffs cite from

---

4. Defendants SBCY, T. Richard Spoor, Kenneth R. Behrins, Robert L. Campbell, and Michael D. Young do not file a memorandum of law in opposition to plaintiffs' motion, and counsel for these defendants has expressed a desire to rest on those arguments made in the brief filed by the FIB defendants. Although under local rule 3(b) failure to submit a memorandum of law may be deemed sufficient cause to grant a motion in default, it would be inappropriate to do so in this case where arguments and authority have been presented to the Court which require that plaintiffs' motion be denied as to all defendants.

5. The PPMs for the Historic Inns, Mt. Ida, and 200 Main St. limited partnerships state that no commissions will be paid from the proceeds of the investments. *See* Pls.' Ex. 33, 34, 44 respectively. The PPM for the Triangle limited partnership is somewhat ambiguous. It states that no syndication fees will be paid and if any are incurred, they will be paid by the general partner, not by the partnership. *See* Pls.' Ex. 41 at note [3]. The remainder of the PPMs disclose

some selling commissions but none states specifically that SBCY will receive any commission. *See* Pls.' Ex. 35–39, 41–43, 45–47; and Defs.' Ex. in Sup. 23.

6. Plaintiffs include Bernaro Nemtzow's purchasing questionnaire in the Frick limited partnership in which SBCY discloses that it will receive fees for due diligence, travel, and investment surveillance and Augustine Marusi's purchasing questionnaire for the Market St. limited partnership in which SBCY discloses that it will receive undetermined but substantial fees for financial consultation services. Pls.' Ex. 40.

Plaintiffs quote from the purchasing questionnaires used in the Marathon Key, Lake Placid, Mt. Vernon, Sebring, Triangle, Marbury, and Transpac 1983–11 limited partnerships to show that SBCY only disclose fees received for due diligence, travel, and investment surveillance. These quotations are made to support plaintiffs' position that SBCY did not disclose any commis-

SBCY's disclosure documents is designed to show that SBCY represented to plaintiffs that it would not receive *commissions* on their investments. Plaintiffs' limited analysis of SBCY's disclosure narrows the scope of this motion. In order to prevail, plaintiffs must demonstrate from the uncontested facts that SBCY received *commissions* pursuant to each investment at issue.

### 2. The Undisputed Facts Do Not Show That SBCY Received Commissions On The Investments At Issue.

Plaintiffs fail to present the Court with undisputed evidence that SBCY received commissions on the investments that are the subject of this motion. Kenneth Behrins, the SBCY principal responsible for negotiating the fees with the general partners and promoters, and Michael Young, another SBCY principal, maintain that the fees received from the limited partnerships were paid for due diligence, surveillance, and monitoring, and therefore did not constitute commissions. Behrins Dep. at 163, 359; Young Dep. at 80–83.[7] Defendants also provide the Court with SBCY's response to plaintiffs' interrogatory in which SBCY lists the non-sales services performed for each limited partnership. Defs.' Ex. in Op. 47. The fact that plaintiffs submit a multitude of documents, in an attempt to impeach the evidence put forth by defendants, confirms the existence of a fundamental factual dispute which compels us to deny plaintiffs' motion. Nevertheless, we discuss plaintiffs' submissions and show why they fail to establish conclusively that SBCY received commissions on the investments at issue.

Many of the documents cited by plaintiffs use ambiguous terms such as "investment fees", Pls.' Ex. 15, or "placement fees"[8] to describe the payments that SBCY received from the limited partnerships. Nonetheless plaintiffs' counsel argues that these documents constitute undisputed evidence that SBCY received commissions on the investments in question. However, Kenneth Behrins' deposition states that the term "placement fees" was not intended to be synonymous with "commission",[9] and therefore these documents merely reveal a disputed issue of fact.

Further, many of the documents that plaintiffs cite describe SBCY's aggregate revenue stream and thus fail unambiguously to support the conclusion that SBCY received commissions on the specific investments at issue. For example, plaintiffs make much of documents associated with Covington & Burling's (FIB's outside counsel) analysis of whether SBCY's activities required it to register as a broker/dealer. The first of these are some handwritten notes attributed to Phyllis Thompson, a Covington & Burling associate, which state that SBCY received fees for, among other things, finding investors for the general partners in limited partnerships. Pls.' Ex. 9. Thompson also received a letter from Young of SBCY that described the payments from the limited partnerships as investment management fees. Pls.' Ex. 6. Young's letter explained that the magnitude of these fees was dependent on two factors; first, the amount of time, travel, and expenses which would be incurred over the life of the investment, and second the amount the general partner would have received for placing the equity absent SBCY's services.[10] *Id.* Thompson then

---

sion payments. Pursuant to a summary judgment motion it may be inappropriate to consider documents quoted in plaintiffs' brief that are not submitted as exhibits. However, since plaintiffs have failed to show that SBCY received commissions on the investments in question, we need not reach this issue.

7. James Fox, CEO of FIIS and Dale Welton, CFO of FIIS, also understood that the fees were paid for non-sales services. Fox Dep. at 66–67; Welton Dep. at 54.

8. The term "placement fee" is used to describe SBCY's non-financial planning revenue in Pls.' Ex. 17, 21, 24, 25, 26, 27, 28.

9. Kenneth Behrins testified as follows at his deposition:

Q. What do you think "placement fees" means?
A. That was a term that I believe First Interstate used to distinguish the fees that we received for due diligence, surveillance, so forth from our financial counseling fees ...

Behrins Dep. at 120.

10. Behrins disputes the accuracy of this portion of the letter, Behrins Dep. at 359, and Young explained at his deposition that the amount the general partner would otherwise receive was used only as a yardstick to assure that fees for

wrote a memorandum which analyzed whether an investment advisory firm, which received *commissions* for acting as a purchasing representative for its clients' limited partnership tax shelter investments, was required to register as a broker/dealer. Pls.' Ex. 16. Even if we were to conclude that these documents demonstrate that SBCY had some commission income, there is no evidence that those commissions were received in connection with the investments that are the subject of the instant motion. Properly disclosed commissions may have been received by SBCY from a number of sources. Plaintiffs represent only about 10% of SBCY's total client base,[11] and commission revenue on SBCY's balance sheet may have resulted from commissions on investments by other SBCY clients. Moreover, SBCY may have received properly disclosed commissions on some of the plaintiffs' investments which are not part of this motion. For example plaintiffs do not seek summary judgment for their investments in the Virginia Square limited partnership, and plaintiffs admit that the PPM for this investment disclosed that SBCY would receive a 6% commission on the sale of each partnership interest. Pls.' Br. in Sup. at 17.[12] Thus, even if plaintiffs' evidence demonstrated that SBCY had some revenue from commissions, this does not support the conclusion that SBCY received commissions on the small subset of investments that are presently before the Court.[13]

The few documents that specifically characterize the fees paid to SBCY by partnerships which are the subject of this motion do not conclusively establish that the payments were commissions. SBCY's cash receipts ledgers for 1985 and 1986 show that SBCY received $150,000 from the Searay limited partnership and $3,400 from the T.W. Decisions limited partnership both of which were entered under the column for "placement fees". Pls.' Ex. 25, 26; *see also* Pls.' Ex. 28 (discussing "placement fees" from the T.W. Decision limited partnership). However, as discussed above, defendants provided evidence that the term "placement fees" is not synonymous with the term "commissions". Behrins Dep. at 120. Similarly, there is a handwritten memorandum from Behrins of SBCY to Dale Welton, a financial officer of FIIS, in which Behrins states that SBCY expects to receive payments from the Transpac, Mt. Ida, Marbury, and Frick limited partnerships in early 1984, and Behrins asks Welton if this income might be looked upon as earned in 1983 for purpose of a calculation that was to be made with regard to FIB's acquisition of SBCY. Welton agreed to discuss the matter with James Fox, President and CEO of FIIS. Pls. Ex. 18. Welton's follow up memorandum to Fox describes these payments as "commissions/fees". Pls.' Ex. 19. The fact that Welton used the term "commissions/*fees* " suggests his uncertainty as to the actual nature of the fees; Welton's deposition states that the fees discussed in his memorandum were for due diligence and other similar services. Welton Dep. at 54. Therefore, this document is not unambiguous support for the conclusion that these payments were commissions as opposed to some other type of fee.[14] Even if it were, the

---

due diligence, travel etc. would be paid out of the general partner's funds without dipping into the investors' contributions. Young Dep. at 82–83.

**11.** SBCY had 233 active clients, only 24 of which were obtained through its contract with Borden. *See* Pls.' Ex. 15.

**12.** Plaintiffs' counsel notes he hopes to demonstrate at trial that the portion of the Virginia Square PPM that disclosed SBCY's commission was redacted in the PPM's sent to plaintiffs. Pls.' Br. in Sup. at 17 n. 10.

**13.** Plaintiffs also cite the following documents which, either directly or indirectly, refer to SBCY's aggregate revenue stream: auditors' reports which discuss the revenue that SBCY received from "placement fees" (Pls.' Ex. 17, 21); a letter from Spoor of SBCY to Fox of FIIS breaking down SBCY's fee revenue to 65% financial planning fees and 35% "investment fees" (Pls.' Ex. 15); a hand written budget which predicts SBCY's "placement fee" revenue (Pls.' Ex. 24); and revenue projections for SBCY which break SBCY's fee revenue into various categories one of which is "placement fees" (Pls.' Ex. 27).

**14.** The only unambiguous statement that SBCY received commissions was provided by Walter Kocher, General Counsel of Borden, who testified at his deposition that the general partner of the Historic Inns limited partnership told him that the partnership paid commissions to SBCY. Pls.' Ex 10 at 153. However, this hearsay may not be considered as evidence in support of plaintiffs' motion. *Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986).

evidence would have to be weighed by the finder of fact against denials by Behrins and Young that any commissions were received by SBCY. Behrins Dep. at 163, 359; Young Dep. at 80–83.

The weakness of plaintiffs' motion is most clearly evident in their reply brief. Plaintiffs' counsel cites Behrins' deposition testimony discussing the various *non-sales* services provided in exchange for the fees received from the Historic Inns, Mt. Ida, and Searay limited partnerships. Pls.' Ex. R 35, 36, 33. Plaintiffs' counsel then contends that the Court should disbelieve this evidence because Behrins is an interested party and suggests that we draw a negative inference from defendants' failure to corroborate Behrins' statement with affidavits from the promoters of the limited partnerships. Pls.' Br. in Reply at 45–46. In resolving this motion we are required to draw all factual inferences in defendants' favor; plaintiffs' impeachment of Behrins' credibility must be reserved for the finder of fact at trial. As discussed above, whether SBCY received commissions pursuant to plaintiffs' investments in the limited partnerships at issue is a question of fact that may not be resolved upon summary judgment.[15]

*B. Since The Undisputed Facts Do Not Show That SBCY Received Undisclosed Commissions, Plaintiffs' Motion Must Be Denied.*

Inadequate disclosure lies at the core of each claim on which plaintiffs seek summary judgment, and since plaintiffs have failed to show from the undisputed facts that SBCY received undisclosed commissions, their motion is denied. Plaintiffs' Rule 10b–5 and common law fraud claims obviously require some central fraudulent conduct, and fraud is also at the heart of the predicate acts supporting the RICO claims. Thus plaintiffs' motion must be denied as to these claims. Further, plaintiffs have failed to demonstrate SBCY's breach of fiduciary duty or any basis upon which to establish a constructive trust in plaintiffs' favor as a matter of law.

■ Borden's breach of contract allegation against SBCY and its principals is the only claim that requires more analysis. Borden entered into a written agreement with SBCY to provide a number of its executives with financial planning services. Pls.' Ex. 2. Although the terms of this contract did not preclude SBCY from receiving payments from limited partnerships, SBCY represented in its initial letter to Borden that it was not a seller of financial instruments, and plaintiffs argue that this representation should be incorporated into the agreement. Pls.' Ex. 1. Even if we were to accept plaintiffs' interpretation of the agreement, summary judgment would not be appropriate because plaintiffs fail to show from the uncontested facts that SBCY received commissions from the limited partnerships and thus plaintiffs cannot demonstrate that SBCY "sold" securities to Borden executives in breach of this agreement. Plaintiffs' motion is therefore denied in full.[16]

---

**15.** Plaintiffs point out that the fees were not likely to have been paid for future services because SBCY did not put aside a reserve fund from which the costs of future services might have been paid. *See* Pls.' Br. in Sup. at 15–18. This evidence is submitted to impeach defendants' contention that the payments were not commissions but were paid for due diligence, surveillance, and monitoring. Behrins Dep. at 163, 359. As stated above, plaintiffs' cross examination evidence will be weighed at trial.

**16.** Earlier in these proceedings, defendants moved the Court to rule that the statute of limitations on a number of plaintiffs' claims had lapsed. Our decision denied defendants' motion in part and noted some disputed issues of fact on which the timeliness of plaintiffs' claims depended. *Borden, Inc. v. Spoor Behrins Campbell &*

*Young, Inc.,* 778 F.Supp. 695, 700 (S.D.N.Y. 1991). Plaintiffs' counsel now contends that the undisputed facts support the resolution of these matters in plaintiffs' favor. We need not reach this argument because the analysis above disposes of plaintiffs' motion.

Similarly, defendants argue that we should deny plaintiffs' motion because plaintiffs' counsel has failed to proffer undisputed evidence supporting causation (both loss and transaction causation) and establishing plaintiffs' reliance on the alleged misstatements. Further, the FIB defendants argue that an issue of fact remains as to whether they had the requisite mental state to support summary judgment in plaintiffs' favor on a number of the claims. Again, pursuant to the analysis above we need not reach defendants' well-argued contentions.

## II. The FIB Defendants' Motion For Partial Summary Judgment

The FIB defendants make their own motion for partial summary judgment. Of the 20 limited partnerships which are the subject of this action, nine were fully funded prior to FIB's, May 23, 1983, acquisition of SBCY. The FIB defendants seek partial summary judgment as to these investments. As movant, the FIB defendants now face the same obstacles that led to the denial of plaintiffs' motion. All inferences which our prior analysis made in defendants' favor now cut against granting defendants' motion because summary judgment is appropriate only if no reasonable fact finder could find for the non-moving party. *Lund's*, 870 F.2d at 844.

■ The conspiracy counts embody plaintiffs' primary theory for extending liability to the FIB defendants for pre-acquisition claims.[17] Plaintiffs contend that beginning in 1979, SBCY and the general partners and promoters of the various limited partnerships at issue formed a conspiracy to defraud investors, and that the FIB defendants joined this conspiracy on or about the time of their acquisition of SBCY and thereby became responsible for all of the conspiracy's past and future civil liabilities. Pls.' Br. in Op. at 29–31.[18] The FIB defendants do not contest the application of the "late joinder" rule to the case at bar, and argue only that parent and subsidiary corporations may not conspire with each other as a matter of law and, alternatively, that the undisputed facts do not support a finding that they conspired to defraud plaintiffs.

### A. A Finding That The FIB Defendants Conspired With Their Subsidiary Is Not Precluded As A Matter Of Law.

■ The FIB defendants point to the parent-subsidiary relationship that existed between themselves and SBCY and argue that this eliminates the possibility of a conspiracy between defendants. To support their position, the FIB defendants largely rely on the Supreme Court's holding in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). We are not convinced that *Copperweld's* reasoning should be extended to the securities fraud, RICO, and common law conspiracies at bar; even if it were so extended, plaintiffs point to a number of third parties—with no corporate relationship to defendants—with whom a reasonable fact finder might find that defendants conspired.

In *Copperweld*, the Supreme Court held that a conspiracy in restraint of trade, in violation of section 1 of the Sherman Antitrust Act, could not be found where the players included only a parent corporation and its wholly owned subsidiary. The court

**17.** Plaintiffs set out the following conspiracy-based causes of action: conspiracy to violate Rule 10b–5 (count III); conspiracy to violate RICO and conspiratorial predicate acts to support their RICO claim (count XV); and a number of common law conspiracies (conspiracy to breach a fiduciary duty (count IX), conspiracy to commit common law fraud (count V), and conspiracy to cause SBCY to receive commercial bribes (count XI)). The FIB defendants point out that some courts have found that there is no private right of action for conspiracy to violate Rule 10b–5 and therefore count V of plaintiffs' complaint may not serve as a separate basis for relief. *Huang v. Sentinel Gov't Sec.*, 709 F.Supp. 1290, 1295–96 (S.D.N.Y.1989); *Kaliski v. Hunt Int'l Resources Corp.*, 609 F.Supp. 649, 653 (N.D.Ill.1985); *but see Deppe v. Tripp*, 863 F.2d 1356, 1367 (7th Cir.1988). However, the issue at this point is somewhat academic because conspiracies involving securities fraud may serve as predicate acts for plaintiffs' RICO claim. *United States v. Weisman*, 624 F.2d 1118, 1123–24 (2d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66

L.Ed.2d 91 (1980) (the language of 18 U.S.C. § 1961(1)(D) is certainly broad enough on its face to include conspiracies involving securities fraud). Although *Weisman* was a criminal RICO case, conspiracy to commit securities fraud may support a civil RICO claim as well. *Zola v. Gordon*, 685 F.Supp. 354, 376 n. 28 (S.D.N.Y. 1988); *First Fed. Sav. and Loan v. Oppenheim, Appel, Dixon & Co.*, 629 F.Supp. 427, 445 (S.D.N.Y.1986); *Kronfeld v. First New Jersey Nat'l Bank*, 638 F.Supp. 1454, 1472–73 (D.N.J. 1986).

**18.** Plaintiffs also contend that their aiding and abetting and control person claims against the FIB defendants extend to three of the nine limited partnerships which are the subject of this motion because a reasonable fact finder may conclude that the FIB defendants' control over SBCY extended all the way back to the letter of intent executed with SBCY on July 1, 1982. However, we need not reach this point because defendants' motion for summary judgment on the conspiracy claims is denied.

noted that vigorous competition, which is at the base of our free market economy, is dependent upon the ability of firms to execute unitary corporate policy and therefore concluded that concerted action within a firm or between a firm and its wholly owned subsidiary is not constrained by section 1 of the Sherman Act. *Id.* at 769–774, 104 S.Ct. at 2740–2743. Since we see no similar social benefit flowing either from agreements to commit securities fraud or to establish and maintain racketeering enterprises, or from joint tortious behavior, we question whether *Copperweld* should be extended to these contexts. Other courts have acknowledged that *Copperweld*'s reasoning is specific to the antitrust context and have not applied it to RICO conspiracies. *Rouse v. Rouse,* 1990 WL 160194, *13 (N.D.N.Y.1990); *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1281 (7th Cir.1989); *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1166–67 (3d Cir.1989); *Curley v. Cumberland Farms Dairy, Inc.,* 728 F.Supp. 1123, 1135 (D.N.J.1989); *see Haroco, Inc. v. American Nat'l Bank and Trust Co.,* 747 F.2d 384, 403 n. 22 (7th Cir. 1984), *aff'd on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). The FIB defendants do not cite, nor have we discovered, any reliable authority stating whether New York law permits finding civil conspiracies between parent and subsidiary corporations.[19] There is some logic in the position that entities, which are made distinct by state corporate law, are also separate entities capable of entering into illicit agreements under state civil conspiracy law. However, we need not reach this issue because the conspiracy at bar includes participants with no corporate relationship to defendants.

Plaintiffs present a conspiracy which involved not only FIB, FIIS, and SBCY, but also the general partners and promoters of the various limited partners at issue. There is some evidence that the FIB defendants knew of, and agreed to participate in, a concerted action between SBCY and the partnership administrators to defraud plaintiffs.[20] The FIB defendants argue that they could not have engaged in such a conspiracy because they had no direct contact with the limited partnership promoters, participating in the affair only through their subsidiary, SBCY. However, to sustain a conspiracy claim, plaintiffs need show only that the conspirators "agreed on a common purpose" and need not show that every conspirator conspired directly with every other member of the conspiracy. *United States v. Nerlinger,* 862 F.2d 967, 973 (2d Cir.1988); *United States v. Friedman,* 854 F.2d 535, 562 (2d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989).[21] Since, as shown below, a reasonable fact finder may conclude that, through an agreement with SBCY, the FIB defendants conspired with third parties to defraud plaintiffs, the conspiracy claims are not invalid as a matter of law.

19. The only case cited by the FIB defendants in support of their position is *Valdan Sportswear v. Montgomery Ward & Co.,* 591 F.Supp. 1188 (S.D.N.Y.1984) which held that agents of a corporation taking action on its behalf can not be held liable for a common law conspiracy. *Id.* at 1191. This language does not support a holding that a parent corporation can not conspire with its subsidiary. The only other case cited by the FIB defendants does not apply New York law. *Bunch v. Artec Int'l Corp.,* 559 F.Supp. 961 (S.D.N.Y.1983) (applying Pennsylvania and Oregon law).

20. The FIB defendants contend that the undisputed evidence supports the conclusion that they did not conspire with SBCY, but this contention is analyzed below at length and rejected.

21. To refute plaintiffs' "chain conspiracy" theory, the FIB defendants argue that the holding in *Copperweld* dictates that a wholly owned subsidiary can not serve as the "link in the chain" which connects a parent corporation to a conspiracy with unrelated third parties. However, in this argument the FIB defendants stretch *Copperweld* beyond even its application in the antitrust context. Counsel for the FIB defendants seem to contend that under *Copperweld,* a parent corporation could conspire with its wholly owned subsidiary to establish a cartel among various unrelated firms, and as long as the parent corporation had no direct contact with the third party conspirators, it would be beyond the reach of section 1 of the Sherman Act. This contention is patently meritless. *Copperweld* holds only that, in the antitrust context, a parent and a subsidiary alone do not a conspiracy make. It does not stand for the proposition that a parent corporation can not conspire with third parties through its subsidiary.

**B. The Undisputed Facts Do Not Preclude A Finding That The FIB Defendants Conspired To Defraud Plaintiffs.**

The FIB defendants argue that the undisputed facts demonstrate that they did not conspire with SBCY to defraud plaintiffs. A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. *Morse v. Weingarten*, 777 F.Supp. 312, 318 (S.D.N.Y.1991). The FIB defendants primarily argue that they did not know that SBCY was receiving undisclosed commissions and therefore could not have entered into an illicit agreement to defraud plaintiffs by concealing this fact; alternatively, they contend that even if they knew of SBCY's scheme to defraud, there is no evidence that they agreed to further these wrongful goals. *Abrams v. Painewebber, Inc.*, 1991 WL 218106 (D.Conn.1991). Since the undisputed facts do not support these arguments, the FIB defendants' summary judgment motion is denied.

▆▆▆▆ As a preliminary matter, we point out that direct proof of a conspiracy is seldom available, and therefore an illicit agreement may be shown via circumstantial evidence. *H.L. Moore Drug Exch. v. Eli Lilly and Co.*, 662 F.2d 935, 941 (2d Cir.1981), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). Proof of tacit, as opposed to explicit, understanding is sufficient to show agreement, and among the factors a fact finder may consider in inferring a conspiracy are the relationship of the parties, proximity in time and place of the acts, and the duration of the actors' joint activity. *Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F.Supp. 802, 813 (S.D.N.Y.1991), *aff'd in part, rev'd in part on other grounds*, 974 F.2d 270 (2d Cir.1992). Further, to demonstrate a conspiracy, plaintiffs need not show that each conspirator agreed to every detail of the conspiracy but only that each agreed on the "essential nature of the plan". *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir.1977).

▆▆▆▆ The FIB defendants first contend that they had no knowledge of SBCY's fraud but admit that they knew that SBCY was receiving fees from the limited partnerships in which plaintiffs invested. In addition, because Dale Welton wrote a memorandum to James Fox in which he referred to SBCY fee income as income for "commissions/fees" and because the FIB defendants' outside counsel wrote a memorandum in which it analyzed whether SBCY's "commission" income would require SBCY to file with the SEC as a broker/dealer, a reasonable fact finder could also conclude that the FIB defendants knew that SBCY received commissions from the partnerships. *See* supra 11, 9. Thus, the FIB defendants argue only that they were not aware of SBCY's inadequate disclosure and always believed that SBCY was fully disclosing to its clients the commissions it received.

To support their position, the FIB defendants point to the depositions of James Fox (president and CEO of FIIS), Dale Welton (senior vice president and CFO of FIIS), and William Bogaard (executive vice president and general counsel of FIB) in which each states that, relying completely on oral representation by SBCY principals, he believed that SBCY was fully disclosing the fees received from the partnerships. Fox Dep. at 29; Welton Dep. at 83–84; Bogaard Dep. at 96. However, Michael Young testified at deposition that when he told representatives of the FIB defendants that the fees were fully disclosed, he was asked to provide documents to corroborate this representation, and in response he provided the FIB defendants with the file on every limited partnership containing SBCY's disclosure documents and its revenue data. Young Dep. 114–15. As plaintiffs have demonstrated in support of their motion a review of these documents would have revealed that SBCY was not disclosing the commissions it received on plaintiffs' investments,[22] and Young stated that pursuant to FIB's acquisition of SBCY a number of FIB's agents reviewed these docu-

---

22. *See* supra 219–20. As discussed in our analysis of plaintiffs' summary judgment motion, the question of whether SBCY perpetrated a fraud upon plaintiffs is dependent upon questions of fact to be resolved at trial. Therefore for the purposes of the FIB defendants' summary judgment motion we will assume that SBCY perpetrated these frauds unless the FIB defendants show otherwise from the uncontested facts.

ments. Young Dep. 137. The FIB defendants contend that since Young admits he was not present during the review of these documents, Young Dep. 119, 138–39, his statements are not sufficient to show that any representative of the FIB defendants read the documents and detected the fraud. However, given that these files were provided at the request of the FIB defendants, and in the context of a discussion of the adequacy of SBCY's fee disclosures, we believe a reasonable fact finder would be justified in concluding that representatives of FIB examined these documents with an eye towards the adequacy of SBCY's fee disclosures.[23]

Further, as an investment advisor, SBCY was require to file ADV forms with the SEC and, after the acquisition, FIB undertook the responsibility of completing and filing these forms for SBCY. Pls.' Ex. 76 (Young Dep. at 104). In the ADV forms filed for 1986 and 1987 FIB made the following representation:

> From time to time the applicant may have a financial interest through its advisory services rendered to an entity selling investment products to applicant's clients. *In every such case a full written disclosure statement is provided to the client indicating the nature and extent of the potential conflict of interest and the extent of the financial interest.*

Defs.' Ex. 32, 33 (emphasis added). The FIB defendants would have the Court rule that although FIB represented, in documents filed with the SEC, that SBCY disclosed the nature and extent of every conflict of interest through a "full written disclosure statement", no reasonable fact finder could conclude that FIB read these written disclosure statements. We find that a reasonable fact finder might easily draw the contrary inference that FIB read these documents pursuant to its preparation of these SEC filings.

The FIB defendants' argument that they knew of the existence and the nature of SBCY's commission revenue, but never knew that the revenue was inadequately disclosed, is undermined by the FIB defendants' detailed review of the disclosure documents in the Searay limited partnership. The FIB defendants admit that they examined the disclosure documents in the Searay limited partnership, and although the Searay PPM discloses substantial fees to be paid to SBCY, the fees are characterized not as commissions but as financial consultation fees. *See* Defs.' Ex. in Sup. 23. If a fact finder concludes, as one might, that the fees paid pursuant to the Searay limited partnership were commissions [24] and if the fact finder concludes that the FIB knew that the fees SBCY received from the limited partnerships were actually commissions, *see* supra 11, 9, the FIB defendants may then be found to have known of SBCY's fraudulent behavior.

 The FIB defendants contend that, even if they knew of the fraud perpetrated by SBCY, there is no evidence that they supported the conspiracy's illicit goal. *Abrams*, 1991 WL 218106; *see In re Investors Funding Corp. of N.Y. Sec. Litig.*, 523 F.Supp. 550, 557 (S.D.N.Y.1980) (conspiracy requires a showing of knowing participation in and attachment to the conspiracy). The undisputed facts do not support this conclusion. The ADV forms filed by FIB represented that the only type of products "sold" by SBCY were financial planning packages for which SBCY received periodic fixed fees. Pls.' Ex. 56. FIB omitted from these filings any discussion of SBCY's sales of limited partnership interests and the commission income received therefrom. At trial, the fact finder may determine that these omissions evidence FIB's desire to conceal SBCY's fraud from the investing public, and therefore the omissions may be found to constitute

---

**23.** In addition, Bogaard stated that he viewed disclosure as "critically important" which lends additional support to the conclusion that the FIB defendants were not likely to rely solely on the oral representations of SBCY to assure themselves that the fee disclosure was adequate. Bogaard Dep. at 96.

**24.** Plaintiffs supply SBCY's cash receipt ledgers for 1985 and 1986 showing $150,000 received

from the Searay limited partnership and categorized as "placement fees". Pls.' Ex. 25, 26. We feel that the plain meaning of the term "placement fee" is sufficiently similar to the term "commissions" that a reasonable fact finder may determine that the two are synonymous despite defendants Behrins' statements to the contrary. Behrins Dep. at 120.

actions by FIB in furtherance of a conspiracy to defraud plaintiffs.[25] *Cf. Newburger, Loeb & Co., Inc. v. Gross,* 563 F.2d 1057, 1074 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978) (civil conspiracy found where corporation knowingly acquiesced in wrongful transfer of partnership assets).

In sum, there are sufficient facts to support a finding that the FIB defendants knew that SBCY was receiving commissions on plaintiffs' limited partnership investments, and that they knew those commission were inadequately disclosed to SBCY's clients. This, coupled with evidence that FIB actively attempted to conceal this fraud from the general public, is sufficient to support a finding that the FIB defendants conspired to defraud plaintiffs. Whether this evidence is sufficiently persuasive to produce a verdict in plaintiffs' favor on the conspiracy counts is a matter that may only be resolved at trial. However, as our analysis above indicates, plaintiffs have raised sufficient factual issues to defeat the FIB defendants' summary judgment motion.

## CONCLUSION

For the foregoing reasons, the parties' cross motions for summary judgment are denied.

SO ORDERED.

---

**25.** In addition, FIB filed an application with the Federal Reserve Board ("the Fed") to obtain approval of its acquisition of SBCY. Defs.' Ex. in Op. 1. Although this application and the subsequent addendum to the application discuss the services provided by SBCY, they do not mention the sales services provided by SBCY to the tax shelter partnerships. *See* Defs.' Ex. in Op. 1, 12. These documents may not evidence an intent to mislead the Fed because Covington & Burling contemporaneously advised FIB as follows:

We believe that services as an offeree representative (pursuant to a fee arrangement whereby the issuer pays a commission to the offeree representative) is so common an activity for investment advisory firms that our application to the [Fed] describing [SBCY] as an investment advisor fairly covers similar activity by [SBCY].

Pls.' Ex. 16 at 3. However, these documents are evidence that FIB was somewhat reluctant to use the word "commissions" in relation to SBCY in public documents, and may provide additional support for a finding that FIB wanted to conceal SBCY's fraudulent conduct.